[Cite as *State v. Moreland*, 2016-Ohio-7588.]

| STATE OF OHIO | ) | | IN THE COURT OF APPEALS |
|---|---|---|---|
| | )ss: | | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | | |

| STATE OF OHIO | | C.A. No. 27910 |
|---|---|---|
| Appellee | | |
| v. | | APPEAL FROM JUDGMENT ENTERED IN THE |
| FREDERICK MORELAND | | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | | CASE No. CR 2015-02-0537 (A) |

DECISION AND JOURNAL ENTRY

Dated: November 2, 2016

CARR, Presiding Judge.

**{¶1}** Defendant-Appellant, Frederick Moreland, appeals from his conviction in the Summit County Court of Common Pleas. This Court affirms.

I.

**{¶2}** On February 13, 2015, the victim in this matter accepted a ride from a woman who, as explained below, acted as an accomplice in the robbery that occurred here. Both the victim and the accomplice were staying at the victim's brother's house in Mansfield, and the accomplice agreed to help the victim move to his sister's house in Kent. After the victim placed his belongings in the accomplice's Jeep Patriot, he and the accomplice set out for Kent. At some point, the accomplice told the victim that she needed to stop in Akron to get money from her cousin.

**{¶3}** The victim stated that the accomplice ultimately made a total of four stops in Akron. At the second stop, the accomplice picked up a black man whom she introduced strictly

as her brother. The man then rode with the accomplice and the victim to a third and fourth location. At the fourth location, the man went inside a house before returning to the car. The victim stated that the man then put a gun to the back of his head and demanded he empty his pockets. Rather than do so, the victim batted the gun away and jumped from the car. He then ran to a neighboring house where he found someone who was willing to call the police.

{¶4} The victim was able to lead the police to the locations where the accomplice had taken him. At the second location, a house on Fairbanks Place in Akron, the police found a Jeep Patriot parked in the driveway. The victim was able to see a pair of his boots through the car window, so the police towed the car. A detective then investigated the individuals who lived at the Fairbanks Place address and discovered that Moreland resided there. The detective compiled a photo array, and the array was presented to the victim. The victim identified Moreland as the man who had held him at gunpoint in the car.

{¶5} A grand jury indicted Moreland on a single count of aggravated robbery and an attendant firearm specification. Six days before his scheduled jury trial, Moreland sought a continuance. The court addressed the motion on the morning of trial, at which time Moreland's counsel clarified that he was requesting a continuance to secure an alibi witness. Moreland's counsel specified that, just a few days earlier, he had learned that there was evidence that could place Moreland at a recording studio at the time of the alleged robbery. Because Moreland would have had knowledge of his own whereabouts and no notice of alibi was filed at an earlier date, however, the trial court denied the motion for a continuance. The trial began and, at its conclusion, the jury found Moreland guilty. The court sentenced him to four years on his aggravated robbery count and three years on his firearm specification for a total of seven years in prison.

**{¶6}** Moreland now appeals from his conviction and raises five assignments of error for our review.

II.

**ASSIGNMENT OF ERROR I**

IN EXCLUDING POTENTIALLY EXCULPATORY EVIDENCE FROM MORELAND'S TRIAL, THE COURT ABUSED ITS DISCRETION, AND IN THE PROCESS, DENIED MORELAND THE DUE PROCESS GUARANTEED HIM BY THE FOURTEENTH AMENDMENT, MERITING REVERSAL.

**{¶7}** In his first assignment of error, Moreland argues that the trial court erred by refusing to allow him to introduce at trial potentially exculpatory evidence. Specifically, he argues that the court erred by not allowing him to introduce alibi evidence and a computer screen image of the accomplice's Facebook page. We disagree with both propositions.

**{¶8}** The decision to admit or exclude evidence lies in the sound discretion of the trial court. *State v. Sage*, 31 Ohio St.3d 173, 180 (1987). "Absent an issue of law, this Court, therefore, reviews the trial court's decision regarding evidentiary matters under an abuse of discretion standard of review." *State v. Aguirre*, 9th Dist. Lorain No. 13CA010418, 2015-Ohio-922, ¶ 6. An abuse of discretion indicates that the trial court's attitude was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). When applying the abuse of discretion standard, this Court may not substitute its judgment for that of the trial court. *Pons v. Ohio State Med. Bd.*, 66 Ohio St.3d 619, 621 (1993).

**Alibi Evidence**

**{¶9}** If a defendant intends to offer alibi testimony,

he shall, not less than seven days before trial, file and serve upon the prosecuting attorney a notice in writing of his intention to claim alibi. The notice shall include specific information as to the place at which the defendant claims to have been at the time of the alleged offense. If the defendant fails to file such written notice, the court may exclude evidence offered by the defendant for the purpose of

proving such alibi, unless the court determines that in the interest of justice such evidence should be admitted.

Crim.R. 12.1. The purpose of the rule "is to insure a fair trial for both the state and the defendant." *State v. Smith*, 50 Ohio St.2d 51, 53 (1977). "Alibi testimony should not be excluded 'where no prejudice would accrue to the prosecution, where there is a demonstrable and excusable showing of mere negligence, or where there is good cause shown.'" *State v. Taylor*, 9th Dist. Summit No. 22882, 2006-Ohio-2041, ¶ 11, quoting *State v. Smith*, 17 Ohio St.3d 98 (1985), paragraph two of the syllabus.

{¶10} Moreland concedes that he never filed a notice of alibi in this matter. It is his position that the court still should have allowed him to present alibi evidence in the interests of justice. *See* Crim.R. 12.1. He argues that his delay in asserting his alibi was the "result of inadvertence, negligence, or even the State's conduct" because "it is clear he believed that the victim was robbed in the small hours of the morning, a time for which [he] had an alibi from the start * * *." According to Moreland, the State delayed in producing discovery and, not until after he filed his motion to continue, did he learn that there were witnesses who could place him at a recording studio on the evening of the robbery. He argues that his alibi evidence would not have prejudiced the State because its officers "had been told by witnesses that [he] had an alibi * * *."

{¶11} Six days before his scheduled trial date, Moreland filed a motion for a continuance. In his one-paragraph motion, defense counsel wrote that he needed more time to prepare for trial because he had "not yet received all of the discovery in this case * * *." The motion made no mention of an alibi and did not specify what additional discovery had not yet been received. On the morning of trial, however, defense counsel indicated that he was seeking a continuance "based on information that [he] received about [Moreland] being at a recording studio * * *" for several hours on the evening of the robbery. He indicated that he had just

received that information "within the last week." When pressed by the trial court as to what exactly he had learned within the last week, defense counsel stated: "I have general information that witnesses have told the officers of where people were, specific information about a recording studio was just -- I just got that information within seven days." The court then inquired as to why Moreland would not have known his own whereabouts at an earlier date. Defense counsel replied: "I think he was under the impression that this incident happened later on [in the evening] * * *." Defense counsel noted that, when Moreland originally turned himself in at the police station, he brought along several hotel receipts that he claimed were evidence of his whereabouts that evening. Because the hotel receipts were time-stamped several hours after the actual robbery, however, they did not provide Moreland with an alibi.

{¶12} The trial court ultimately denied defense counsel's request for a continuance. The court reasoned that, while defense counsel may not have learned more about Moreland's whereabouts until the eve of trial, Moreland himself had always been aware of that information. The court found that Moreland did not have a good faith basis for failing to disclose that evidence at an earlier date. It also found that the State would have been prejudiced by the introduction of Moreland's alibi testimony because the State would not have had time to investigate it. Thus, the court refused to allow Moreland to present alibi evidence. The court did, however, permit defense counsel to make two proffers regarding Moreland's proposed alibi evidence.

{¶13} Defense counsel made his first proffer after Moreland's significant other testified at trial. Specifically, defense counsel proffered the following:

> I believe that [Moreland's significant other] was going to testify that her and Frederick Moreland, that their routine is to spend the entire day together for Valentine's Day on February 13th, because his son that doesn't live with them,

> [his] birthday is the 14th, so [Moreland] uses that day to spend with his son. So he -- the last five years, they have spent every February 13th together.
>
> This year, at some point in the evening, [Moreland's significant other] was going to testify that she was at a recording studio on Laird Street * * *. And they were drinking, celebrating Valentine's Day at that residence, and then later on in the evening got a hotel room as they have done every year for the last five years.

Following Moreland's own testimony, defense counsel made a second proffer that reads as follows:

> [Moreland], as well as [his significant other], were going to testify that they were at a recording studio on the corner of Laird. * * * They were at the recording studio for several hours that evening on the 13th, and then they went to a hotel, and that they do this every February 13th in celebration of Valentine's Day, because Mr. Moreland spends Valentine's Day with his son * * *.

Moreland did not proffer any additional testimony regarding his purported alibi.

{¶14} Having reviewed the record, we cannot conclude that the court abused its discretion by refusing to allow Moreland to present his alibi testimony. First, it is not clear from the record that any discovery delay on the part of the State caused Moreland to miss the deadline for filing a notice of alibi. Moreland's brief suggests that he delayed filing his alibi because he believed the robbery here occurred "in the small hours of the morning, a time for which [he] had an alibi from the start * * *." Moreland, however, never filed *any* notice of alibi. That is, he never filed a notice of alibi for a later time period based on a mistaken assumption about the time that the robbery occurred. On the morning of trial, defense counsel acknowledged that there was a six-hour gap between the time of the robbery and the timestamp on the hotel receipts that Moreland originally provided the police to explain his whereabouts. He further acknowledged that he had received in discovery "general information" about "where people were" that day. Defense counsel never claimed that he had just discovered, on the eve of trial, when the robbery actually occurred. Instead, he stated that he had just discovered the "specific information about a recording studio * * *." Accordingly, the record does not support Moreland's contention that he

missed Crim.R. 12.1's filing deadline due to his confusion over when the robbery actually occurred.

{¶15} Second, the alibi evidence that Moreland sought to introduce was always in his possession. Defense counsel proffered that Moreland and his significant other would have testified that they routinely celebrated Valentine's Day by spending "the entire day together" on February 13th and getting a hotel room in the evening. That evidence was not evidence that Moreland received at the last minute due to discovery delays on the part of the State. Indeed, it was not even evidence that he received from the State. It was evidence that would have been known to him from the inception of his criminal case, and there was nothing to prevent him from asserting that evidence in a timely filed notice of alibi. Moreland has not explained why he could not have asserted the foregoing alibi at an earlier date so as to give the State the opportunity to investigate it.

{¶16} As previously noted, the purpose of Crim.R. 12.1 "is to insure a fair trial for both the state and the defendant." *Smith*, 50 Ohio St.2d at 53. The notice requirement contained therein

> "[p]ertains to a very important feature of the criminal law. It gives the state some protection against false and fraudulent claims of alibi often presented by the accused so near the close of the trial as to make it quite impossible for the state to ascertain any facts as to the credibility of the witnesses called by the accused."

*State v. Jamison*, 49 Ohio St.3d 182, 186 (1990), quoting *State v. Thayer*, 124 Ohio St. 1, 4 (1931). Because Moreland did not disclose his proffered alibi testimony in a timely manner, the State lost the opportunity to investigate that testimony. *See State v. Russell*, 26 Ohio App.3d 185, 187 (9th Dist.1985), citing *Smith* at 53 (setting forth three questions for the court to consider when reviewing exclusion of alibi evidence). Additionally, Moreland failed to state a good faith basis for not having filed that alibi in a timely manner, as he would have known if he and his

significant other had spent "the entire day together" on the day of the robbery. *See Russell* at 187. Finally, Moreland has not shown that the exclusion of his alibi testimony deprived him of a fair trial. *See id.* As explained below, the defense theorized that Moreland's brother, rather than Moreland, may have perpetrated the crime here. Both Moreland and his significant other testified at trial regarding Moreland's brother, and the jury was able to assess their credibility. Moreland testified that he did not know the victim or the accomplice, was not familiar with the accomplice's Jeep Patriot, and did not commit the robbery. Accordingly, Moreland's and his significant other's proffered testimony that they were together on the day of the robbery only would have served to corroborate to some degree the testimony that the defense had already offered.

{¶17} Based on the facts and circumstances of this case, we cannot conclude that the trial court's decision to exclude Moreland's alibi evidence was arbitrary, unconscionable, or unreasonable. Accordingly, we reject Moreland's argument to the contrary. To the extent his first assignment of error concerns the exclusion of his alibi evidence, it is overruled.

**Facebook Evidence**

{¶18} Detective David Garro investigated the robbery that occurred here. He testified that, approximately one to two weeks after the robbery, he viewed the accomplice's Facebook account and took a screen shot of her Facebook page. While cross-examining Detective Garro, Moreland attempted to introduce the screen shot that the detective took, and the State objected. The trial court ultimately refused to allow Moreland to introduce the screen shot because Moreland had failed to lay an adequate foundation for its admissibility. The court deemed the screen shot irrelevant because there was no evidence to show that it was reflective of the accomplice's Facebook page, as it existed at the time of the robbery.

{¶19} Moreland argues that the court erred by excluding the screen shot because Detective Garro provided an adequate foundation for its introduction. Moreland argues that, because Detective Garro created the screen shot, he could establish its authenticity. According to Moreland, whether the screen shot accurately portrayed the accomplice's Facebook page at the time of the robbery was a question of weight, not admissibility.

{¶20} Even assuming that the trial court erred by excluding the screen shot, Moreland has not explained how he was prejudiced by the court's ruling. *See* Crim.R. 52(A) (errors that do not affect substantial rights "shall be disregarded"). Moreland sought to introduce the screen shot for the purpose of showing that he was not listed as one of the accomplice's Facebook friends. Although the court did not allow him to introduce the screen shot, it did allow him to ask Detective Garro about its contents. Moreland specifically asked the detective whether, at the time he took the screen shot, he (Moreland) and the accomplice were listed as friends. Detective Garro replied: "No, I did not find a friend link between those two individuals." Consequently, Moreland was able to elicit testimony that he and the accomplice were not Facebook friends, and the trial court's error in not admitting the screen shot, if any, was harmless. *See id.* To the extent Moreland's first assignment of error concerns the exclusion of the Facebook screen shot, it is overruled.

### ASSIGNMENT OF ERROR II

PROSECUTORIAL MISCONDUCT DEPRIVED MORELAND OF HIS RIGHTS TO DUE PROCESS UNDER THE FOURTEENTH AMENDMENT, MERITING REVERSAL.

{¶21} In his second assignment of error, Moreland argues that his conviction must be overturned on the basis of prosecutorial misconduct. Specifically, he argues that he was deprived of a fair trial because the prosecutor referred to evidence outside the record in closing,

denigrated defense counsel when questioning a witness, and failed to disclose certain evidence in a timely manner. We do not agree that Moreland was deprived of a fair trial.

**{¶22}** In deciding whether a prosecutor's conduct rises to the level of prosecutorial misconduct, a court determines if the prosecutor's actions were improper, and, if so, whether the defendant's substantial rights were actually prejudiced. *State v. Smith*, 14 Ohio St.3d 13, 14 (1984). "[A] judgment may only be reversed for prosecutorial misconduct when the improper conduct deprives the defendant of a fair trial." *State v. Knight*, 9th Dist. Lorain No. 03CA008239, 2004-Ohio-1227, ¶ 6, citing *State v. Carter*, 72 Ohio St.3d 545, 557 (1995). The defendant must show that, but for the prosecutor's misconduct, the trier of fact would not have convicted him. *State v. Lollis*, 9th Dist. Summit No. 24826, 2010-Ohio-4457, ¶ 24. "The touchstone of the analysis 'is the fairness of the trial, not the culpability of the prosecutor.'" *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, ¶ 140, quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982).

**Closing Argument**

**{¶23}** Moreland first argues that he was deprived of a fair trial because, in his closing argument, the prosecutor referred to evidence outside the record. We note that Moreland also moved for a new trial on this basis. He has not assigned as error, however, that the court erred in ruling on his motion. *See State v. Pleban*, 9th Dist. Lorain No. 10CA009789, 2011-Ohio-3254, ¶ 41, quoting *State v. Marzolf*, 9th Dist. Summit No. 24459, 2009-Ohio-3001, ¶ 16 ("An appellant's captioned assignment of error 'provides this Court with a roadmap on appeal and directs this Court's analysis.'"). As such, in addressing his prosecutorial misconduct argument, we need not address the court's ruling on his motion for a new trial. *See State v. Miller*, 9th Dist. Summit No. 27048, 2015-Ohio-279, ¶ 18.

{¶24} During cross-examination, the victim denied that he had ever been in a romantic relationship with the accomplice or that he had engaged in sexual intercourse with her. The following exchange took place:

> [DEFENSE COUNSEL]: Had you known [the accomplice] before the two weeks, or did she just live with you for two weeks?
>
> [THE VICTIM]: Like I said, my brother introduced me to her, and that's when she started staying with us.
>
> [DEFENSE COUNSEL]: And you wouldn't consider her your girlfriend?
>
> [THE VICTIM]: No. My girlfriend is outside right now.
>
> [DEFENSE COUNSEL]: But she is -- but she -- she wasn't your girlfriend at the time?
>
> [THE VICTIM]: Who wasn't my girlfriend?
>
> [DEFENSE COUNSEL]: [The accomplice].
>
> [THE VICTIM]: No.

On cross-examination, Detective Garro gave testimony that conflicted with the victim's. He confirmed that, after he interviewed the victim, it was his understanding that the victim and the accomplice were in a sexual relationship. Detective Garro agreed that there was a "disconnect" between the victim's statement and his testimony.

{¶25} During closing argument, Moreland's counsel repeatedly attacked the victim's credibility on the basis that he had "either lied on the stand or [had] lied to the detective" about his relationship with the accomplice. The prosecutor then sought to rehabilitate the victim's character on rebuttal. Specifically, the prosecutor argued:

> [The victim]. He had some facts different than his original version, absolutely. No doubt about it.
>
> His version of what his relationship with [the accomplice] is [is] very different today than it was a couple months ago. His girlfriend, he also testified, was in the

next room; his girlfriend that he was still dating at the same time that this was going on.

Defense counsel then objected to the prosecutor's argument, and the trial court sustained the objection. When the prosecutor resumed his rebuttal, he focused on the amount of evidence that corroborated the victim's version of the events.

{¶26} Moreland argues that the prosecutor deprived him of a fair trial when, in seeking to rehabilitate the victim, he referred to evidence outside the record. He has not explained why this Court should address his argument, given that the trial court sustained his objection to the prosecutor's statement. *See State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, ¶ 177, quoting *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, ¶ 162 (appellant generally "cannot predicate error on objections the trial court sustained."). Even assuming his argument is properly before us, however, we reject it on its merits.

{¶27} "Neither the defense nor the prosecution may refer to evidence that is not in the record." *State v. McKelton*, Slip Opinion No. 2016-Ohio-5735, ¶ 286, quoting *State v. Brown*, 38 Ohio St.3d 305, 316 (1988), fn. 7. "Prosecutors must avoid insinuations and assertions calculated to mislead." *State v. Lott*, 51 Ohio St.3d 160, 166 (1990). Even so, "taking into account the reality of the human fallibility of the participants, there can be no such thing as an error-free, perfect trial, and [] the Constitution does not guarantee such a trial." *Id.*, quoting *United States v. Hasting*, 461 U.S. 499, 507-508 (1983). The Constitution only requires that the defendant have received a fair trial in spite of any improper conduct on the part of the prosecutor. *Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, at ¶ 140, quoting *Smith*, 455 U.S. at 219.

{¶28} The trial court properly sustained Moreland's objection to the prosecutor's argument because there was no evidence that the victim "was still dating" his girlfriend at the time of the robbery. *See McKelton* at ¶ 286, quoting *Brown* at 316, fn. 7. Although the victim

testified that he had a girlfriend and that she was outside the courtroom, he never said that he and his girlfriend were dating when the robbery occurred. Accordingly, it was improper for the prosecutor to state that as a fact in his closing argument. Even so, Moreland has not shown that the prosecutor's misconduct deprived him of a fair trial. *See Diar* at ¶ 140, quoting *Smith* at 219. The prosecutor's statement was brief and isolated. *See Lott* at 166. Moreover, it only transpired on rebuttal, following defense counsel's in-depth attack on the victim's credibility. *See id.* The remainder of the prosecutor's argument focused on the evidence at trial, which included several witness identifications and the fact that the police found the car involved in the robbery parked in Moreland's driveway. Following defense counsel's objection to his improper statement, the prosecutor focused strictly on the evidence admitted at trial and how that evidence corroborated the victim's version of the events. There was evidence that the police discovered the accomplice's car in Moreland's driveway immediately after the robbery. Additionally, the jury heard testimony from three separate individuals who identified Moreland as the man who was with the accomplice on the evening of the robbery. Upon review, the record does not support the conclusion that the prosecutor's statement affected Moreland's substantial rights. *See Smith*, 14 Ohio St.3d at 14. Consequently, we reject Moreland's argument to the contrary.

**Denigrating Defense Counsel**

{¶29} Next, Moreland points to a single instance in the record where he claims that the prosecutor denigrated his counsel. Because Moreland concedes that his counsel did not object to the prosecutor's alleged misconduct, we review his argument for plain error.

{¶30} "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus. "The doctrine of plain error

requires that there must be: (1) a deviation from a legal rule; (2) that is obvious, and; (3) that affects the appellant's substantial rights." *State v. White*, 9th Dist. Summit No. 27683, 2016-Ohio-4829, ¶ 36. In order to succeed on a plain error claim, the appellant must demonstrate that but for the errors he alleges, the outcome of the trial would clearly have been different. *State v. Waddell*, 75 Ohio St.3d 163, 166 (1996); Crim.R. 52(B). "[T]he accused bears the burden of proof to demonstrate plain error on the record * * *." *State v. Jackson*, 9th Dist. Summit No. 27479, 2015-Ohio-5096, ¶ 51, quoting *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, ¶ 22.

**{¶31}** Two patrolmen testified that they interviewed the victim directly after he was robbed: Officer Joseph Hay and Officer Michael Thornton. Officer Hay testified first. On cross-examination, defense counsel asked him whether the victim had given a description of the black male who robbed him. Officer Hay stated that Officer Thornton had drafted their incident report and that he could not recall exactly what information was recorded in the report. The following exchange took place:

> [DEFENSE COUNSEL]: No description of height, skin color -- well, complexion, different shades of black, didn't give you anything like that, no clothing description, nothing like that, correct?
>
> [OFFICER HAY]: From what I recall, I don't -- I couldn't tell you.
>
> [DEFENSE COUNSEL]: If it is not in the report, [the victim] probably didn't say it, correct?
>
> [OFFICER HAY]: Correct.

The State did not ask Officer Hay any questions on redirect, but asked Officer Thornton about the incident report when he took the stand.

**{¶32}** During direct examination, the prosecutor handed Officer Thornton his incident report and asked whether the victim had given him any description of the man who had robbed

him.  Officer Thornton reviewed the incident report and testified that the victim described his assailant by race, age, and approximate height and weight.  He testified that the victim also described the clothing that his assailant had been wearing.  The following exchange then took place:

[PROSECUTOR]: So if Officer Hay said he wasn't sure whether you guys had actually gotten a description, he would be mistaken?

[OFFICER THORNTON]: Yes.

[PROSECUTOR]: There you go.

[DEFENSE COUNSEL]: What's that?  Are you done?

[PROSECUTOR]: No.

The prosecutor then continued with his direct examination.

{¶33}  Moreland argues that the prosecutor's "[t]here you go" comment amounted to a disparaging remark at defense counsel's expense.  According to Moreland, the comment indicated that the prosecutor found defense counsel's earlier line of questioning "petty, bothersome, and/or inconsequential."  He argues that the comment was meant to undercut his defense in the eyes of the jury.

{¶34}  "Isolated comments by a prosecutor are not to be taken out of context and given their most damaging meaning."  *State v. Hill*, 75 Ohio St.3d 195, 204 (1996).  It is entirely unclear from the record here what the prosecutor meant when he said "[t]here you go."  Not having the benefit of the prosecutor's inflection, if any, or any visual clues, the reader must speculate as to the meaning of his comment.  While Moreland attempts to frame the comment as a disparaging remark, the prosecutor just as easily could have been handing something to defense counsel (e.g., Officer Thornton's incident report), thereby prompting defense counsel to inquire: "[w]hat's that?"  Conversely, defense counsel could have asked "[w]hat's that?" strictly because

he did not hear what the prosecutor said. The point is that the transcript alone does not contain enough information about the exchange to unveil its meaning, and this Court will not engage in speculation. Because Moreland has not shown on the record before us that an obvious error occurred here, we reject his argument to the contrary.

**Withholding Discovery**

{¶35} Finally, Moreland argues that the prosecutor engaged in misconduct with regard to discovery because he withheld evidence on two occasions. He argues that the prosecutor violated Crim.R. 16 when he: (1) did not disclose until a few days before trial the time of the robbery and the fact that witnesses could place Moreland at a recording studio at that time; and (2) waited two days to inform defense counsel that the victim had seen a female acquaintance of Moreland's in the courtroom, wearing his stolen jacket.

{¶36} Crim.R. 16 requires the State, upon a defendant's written demand for discovery, to provide the defense with "[a]ny evidence favorable to the defendant and material to guilt or punishment * * *." Crim.R. 16(B)(5). "Prosecutorial violations of Crim.R. 16 are reversible only when there is a showing that: (1) the prosecution's failure to disclose was a willful violation of the rule; (2) knowledge of the information would have benefited the accused in the preparation of the defense; and (3) the accused suffered some prejudicial effect." *State v. Sadeghi*, 9th Dist. Wayne No. 14AP0051, 2016-Ohio-744, ¶ 16, citing *State v. Joseph*, 73 Ohio St.3d 450, 458 (1995). "The overall purpose [of the rule] is to produce a fair trial." *Lakewood v. Papadelis*, 32 Ohio St.3d 1, 3 (1987).

{¶37} This Court previously addressed Moreland's contention that the State withheld pre-trial discovery from him by not disclosing in a timely manner when the robbery here occurred and the fact that witnesses could place him at a recording studio at that time. As we

noted earlier, the record does not support Moreland's claim that he did not discover the exact time of the robbery until the eve of trial. His counsel stated that the only specific information he learned within a few days of trial was that Moreland had been at a recording studio on the day of the robbery. Even if the prosecutor failed to timely disclose that information, however, it is unclear how it would have benefitted Moreland or how he was prejudiced by not having learned it sooner. *See Sadeghi* at ¶ 16. Moreland argues that he was prejudiced because, had he learned the information sooner, he could have raised a timely alibi defense. Yet, Moreland always would have known his own whereabouts on the day of the robbery. Moreover, the alibi testimony that he proffered placed him with his significant other for the entire day, so she always could have testified that Moreland was with her. Moreland has not shown that the prosecutor deprived him of a fair trial by withholding the foregoing information in pre-trial discovery. Accordingly, we reject his argument to the contrary.

{¶38} Next, Moreland argues that the prosecutor engaged in misconduct when he waited two days to inform defense counsel that the victim allegedly saw a female acquaintance of Moreland's wearing his stolen jacket in the courthouse. The prosecutor raised the issue on the third day of trial, directly before calling the victim to the stand. The prosecutor informed the court that, two days earlier, the victim had seen a female who appeared to be "part of [Moreland's] entourage" wearing his stolen, custom-made Nike jacket in the courthouse. The prosecutor sought to question the victim about the incident, and defense counsel asked to exclude the testimony because he was just made aware of it. The court ultimately refused to exclude the testimony because it found that defense counsel would not "face[] any significant prejudice that [could not] be dealt with through [his] normal vigorous and effective cross-examination * * *." Moreland, however, argues that he was prejudiced by the prosecutor's failure to immediately

report the alleged jacket sighting because it prevented him "from cross-examining two investigating police officers about why they did not seek a warrant to search the premises of [his home] on February 13."

{¶39} On direct examination, the victim described his stolen jacket as a custom-ordered Nike jacket that was black, blue, and orange. He testified that he saw a young lady wearing his jacket to court, but did not know who she was. On cross-examination, Moreland's counsel did not ask the victim any questions about the jacket or the young woman he had seen. When Moreland's significant other later testified, however, the State asked her whether she had worn a jacket to court on the first day of trial, and she agreed that she had. She also described the jacket as black and blue in color. On cross-examination, she testified that the jacket was just an ordinary jacket, not a Nike jacket, and that she had borrowed it from Moreland's sister.

{¶40} Moreland has not shown that he was prejudiced by the prosecutor's failure to immediately disclose the fact that the victim had seen a female acquaintance of Moreland's wearing his jacket to court. *See Sadeghi* at ¶ 16. His significant other specifically testified that the jacket she wore to court was not a Nike jacket and that she had borrowed it from Moreland's sister. The jury, therefore, could have chosen to believe that the jacket was not the victim's. Because the jacket was not the only item taken from the victim, the jury still could have found Moreland guilty of aggravated robbery even if the jurors believed Moreland's significant other's testimony. Moreland's sole argument as to why he was prejudiced by the prosecutor's two-day delay is that it allegedly affected his cross-examination. According to Moreland, the prosecutor's delay deprived him of the opportunity to ask two officers, who had already testified, why they did not secure a search warrant for his house on the day of the robbery. Yet, Moreland could have asked the officers that question regardless of the jacket. Further, he has not explained

how that question, had he asked it, would have changed the result in this matter. *See* App.R. 16(A)(7). Having reviewed the record, we cannot conclude that the prosecutor's conduct deprived Moreland of a fair trial.

**Cumulative Effect**

{¶41} Moreland's brief also contains a blanket statement that the cumulative effect of the prosecutor's misconduct deprived him of a fair trial. "Under the cumulative error doctrine, a conviction may be reversed when the cumulative effect of errors deprives a defendant of the constitutional right to a fair trial even though none of the errors, in isolation, was prejudicial." *State v. Boone*, 9th Dist. Summit No. 26104, 2013-Ohio-2664, ¶ 38, citing *State v. DeMarco*, 31 Ohio St.3d 191 (1987), paragraph two of the syllabus. Moreland has not separately assigned as error that cumulative errors deprived him of a fair trial. *See State v. Bowerman*, 9th Dist. Medina No. 13CA0059-M, 2014-Ohio-4264, ¶ 16, fn. 2. Nor has he cited any case law in support of his argument. *See* App.R. 16(A)(7). Assuming his argument is properly before us, however, we must conclude that it is meritless.

{¶42} There is no evidence that the prosecutor engaged in a pattern of misconduct or took part in any egregious behavior. The prosecutor referred to evidence outside the record on a single occasion, and the court sustained an objection to his statement. Even if the prosecutor could have disclosed certain information in a timelier manner, his failure to do so did not prevent Moreland from either filing a timely notice of alibi or presenting his defense. Moreland has not shown that the prosecutor's actions, even when viewed collectively, deprived him of a fair trial. As such, his second assignment of error is overruled.

## ASSIGNMENT OF ERROR III

MORELAND'S CONVICTION IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, MERITING A NEW TRIAL.

**{¶43}** In his third assignment of error, Moreland argues that his conviction is against the manifest weight of the evidence. Specifically, he argues that the jury lost its way when it chose to believe that he was the individual who perpetrated the crime here. We disagree.

**{¶44}** A conviction that is supported by sufficient evidence may still be found to be against the manifest weight of the evidence. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997).

> In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the fact[-]finder's resolution of the conflicting testimony." *Thompkins* at 387, quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). An appellate court should exercise the power to reverse a judgment as against the manifest weight of the evidence only in exceptional cases. *Otten* at 340.

**{¶45}** The victim testified that he met the accomplice through his brother, with whom he was living at the time. He testified that the accomplice stayed with him and his brother in Mansfield for about two weeks before he decided to move out. The accomplice offered to drive the victim to his new residence in Kent, and he accepted her offer. He testified that, on the day of the robbery, he placed his belongings in the accomplice's black Jeep, and the two left for Kent.

**{¶46}** The victim testified that the accomplice made a few phone calls and sent several text messages while she was driving. At some point, she told the victim that she needed to stop in Akron to get money from her cousin. The victim testified that the accomplice drove him to a

house in Akron and knocked on the door while he waited in the car. When no one answered the door, the accomplice returned to the car and drove him to another house on Fairbanks Place. At the second house, the accomplice asked the victim whether he wanted to come inside, but he declined. The victim testified that he waited in the car while the accomplice went inside the house. The accomplice then emerged with another man, whom she introduced to him strictly as her brother. The victim testified that the accomplice asked him to clear his things out of the way so that the man could sit in the backseat. After the victim did so, the accomplice and the man went back inside the house for another 10 to 15 minutes while the victim continued to wait in the car. The accomplice and the man then emerged again and told the victim that they needed to go to AutoZone. The victim testified that the man sat in the backseat while the accomplice drove.

{¶47} Instead of AutoZone, the accomplice drove to a nearby convenience store. The victim testified that the man in the backseat went inside the store to make a purchase and, before he did so, the victim turned around and handed him some money so that he could buy an item for the victim as well. Once the man returned to the car, the accomplice drove to a fourth location: a house on Minota Avenue. The victim testified that he waited in the car as the man in the backseat went inside the house. As the victim waited and focused on his cell phone, the man came back outside and once again climbed into the backseat. The victim testified that he then felt the barrel of a gun being pressed against the back of his head. According to the victim, the man in the backseat hit him over the head and demanded that he empty his pockets. Rather than do so, the victim batted away the gun and threw himself from the car, which the accomplice had begun to drive down the street. The victim testified that, although he hurt himself jumping from the car, he was able to get up and run to a nearby house for help.

{¶48} Officer Joseph Hay testified that, at approximately 6:30 p.m. that same day, he and Officer Michael Thornton were dispatched to Minota Avenue to respond to a robbery. When they arrived, they found the victim "panicked" and "very distraught." Officer Hay saw that the victim had cuts and scratches on his hands and back, as well as an abrasion on the back of his head. The victim informed the officers that he had been robbed at gunpoint by a black man whom he had met through the accomplice. Officer Thornton testified that the victim was able to describe the accomplice's clothing, as well as the clothing and physical attributes of the man who had robbed him. Specifically, the victim said the man was between 20 to 25 years of age, stood approximately 5'11" to 6'1" tall, and weighed about 150 to 160 pounds. The victim also described the man as wearing an orange hooded sweatshirt and gray sweatpants. Officer Thornton testified that the victim initially described the accomplice's car as a black Jeep Commando that was covered in salt. Accordingly, while he and Officer Hay were still speaking with the victim, he asked dispatch to issue a BOLO notification (i.e., be on the lookout) for a car matching that description.

{¶49} Officer Nick Manzo testified that he and his partner were patrolling Akron on the evening of the robbery when they heard the BOLO notification for a black Jeep Commando covered in salt. A few minutes after receiving the notification, Officer Manzo saw a car that he believed matched that description and followed it to a house on Fairbanks Place. He testified that he and his partner waited until the female driver of the car and her male passenger parked in the driveway and exited the car. Officer Manzo and his partner then exited their cruiser and went to speak with them. Officer Manzo stated that the man and woman were cooperative and stated that they had just come from MJ's Drive Through. He never asked their names, however, because, upon closer inspection, the car they had been driving was a Jeep Patriot, not a

Commando. Officer Manzo testified that he and his partner verified with dispatch that the BOLO notification they received was for a Jeep Commando. He testified that, when dispatch confirmed that was the case, they quickly left the scene. Officer Manzo agreed that he was later asked to view a photo array to see if it contained a photograph of the man he had seen that evening. Officer Manzo selected Moreland from the photo array and noted that he was 70% sure of his choice. He also identified Moreland in court as the man he had seen that evening.

{¶50} Officer Hay stated that, after the victim received medical attention, he was able to lead him and his partner back to the house on Fairbanks Place where the accomplice had picked up the man who had robbed him. Parked in the driveway of the house, they found a black Jeep Patriot that the victim identified as the accomplice's car. Officer Hay also saw a female inside the house wearing the same type of clothing that the victim said he had seen the accomplice wearing. Nevertheless, no one would answer the door when Officer Hay knocked. Officer Hay testified that he and Officer Thornton arranged for the Jeep Patriot to be towed to the police station because the victim was able to see a pair of his boots through the car window.

{¶51} Detective David Garro testified that he interviewed the victim at the police station after the robbery and investigated the matter in the days that followed. He testified that he was able to identify Moreland as the resident of the address on Fairbanks Place where the police found the accomplice's Jeep. Accordingly, he created a photo array to be presented to the victim and later to Officer Manzo. Although Detective Garro did not administer the photo array that the victim viewed, he confirmed that the victim selected Moreland from the photo array and noted that he was 75% certain of his choice.

{¶52} Detective Garro testified that, during the course of his investigation he also secured a copy of the security tapes from MJ's Drive Through and attempted to contact the

accomplice. He testified that he spoke with the accomplice on the phone a few times, but that he lost contact with her once she was charged for her role in the robbery. Detective Garro confirmed that the police searched the accomplice's Jeep and discovered an empty box for a Sig Sauer Mosquito Pistol in the backseat. Meanwhile, a warrant was issued for Moreland's arrest, and Moreland turned himself in. Detective Garro spoke with Moreland when he voluntarily surrendered himself. He testified that Moreland presented him with several hotel receipts that he claimed were evidence of his whereabouts on the evening of the robbery. The receipts, however, only showed that Moreland had checked into a hotel shortly after 12:00 a.m. on February 14th.

{¶53} The jury also heard testimony from the manager of MJ's Drive Through. He testified that, on February 14, 2015, he provided the police with a copy of the store's security footage from the previous evening. The footage depicts a black man in an orange hooded sweatshirt emerging from the backseat of a black Jeep and then coming into the store to make a purchase at the counter. The manager testified that he was not working at the store that evening, but that he watched the security footage along with the police. He testified that he was initially unsure of the identity of the man on the tape, but, after viewing it many times, he recognized the man as a customer who frequented the store on a daily basis. Although he did not know the customer's name, he testified that he would interact with him and "jok[e] around" when he came into the store. In court, the manager identified Moreland as the man in the video. He admitted that, sometime after he viewed the video, he also viewed a photo array and was not able to select Moreland's photograph from the array. He testified that he thought he saw a picture of a man that looked like Moreland in the array, but that he was not sure that it was him because the picture appeared to be an old one. The manager confirmed that he recognized Moreland from the security footage.

{¶54} Stacy Violi, a forensic scientist in the DNA section at the Bureau of Criminal Identification ("BCI"), testified that she analyzed several swabs that the police took from the inside of the accomplice's Jeep and the hood of the victim's sweatshirt. Violi testified that she found the victim's DNA on the swabs taken from the inside of the Jeep, but that Moreland was excluded as a contributor. As to the swab from the hooded sweatshirt, she testified that the swab contained the victim's DNA, the DNA of one unknown individual, and additional DNA from a third individual. She testified that Moreland could be excluded as the source of the DNA from the unknown individual, but that there was not sufficient data to allow her to reach any conclusions about the source of the additional DNA that she found.

{¶55} Apart from his testimony about the robbery itself, the victim also testified that he saw a female in the courthouse wearing his stolen jacket. He testified that the jacket was a "rare jacket" because he had customized it himself on Nike's website. He indicated that he had put the colors black, blue, and orange on the back for the Brazilian soccer team. According to the victim, he did not know the woman wearing his jacket, but she was present on the first day of trial and was present again that day.

{¶56} Moreland's significant other testified on his behalf. She stated that she and Moreland had been a couple for five years and that she lived at the house on Fairbanks Place with him and their children. She testified that Moreland's brother was also living with them back in February and that he and Moreland had a similar appearance. She testified that Moreland's brother was about two inches shorter and weighed about 40 pounds less than Moreland, but that the two had similar complexions. She admitted that she had worn a black and blue jacket to the courthouse on the first day of trial and that, while she was there, the victim's girlfriend had confronted her and accused her of wearing the victim's jacket. According to

Moreland's significant other, however, the jacket belonged to Moreland's sister and she had borrowed it. She denied that the jacket was a custom Nike jacket.

{¶57} Moreland also called Officer Christopher Schwan to testify. Officer Schwan testified that he was partnered with Officer Manzo on the evening of the robbery. He confirmed that, after receiving a BOLO notification, he and Officer Manzo followed a black Jeep to a house on Fairbanks Place. Officer Manzo admitted that, when he later viewed a photo array to try to identify the man that he and his partner had seen that evening, he selected someone other than Moreland. He testified, however, that he never actually spoke to the man or woman that he and his partner saw that evening because he was the "cover officer." He explained that being the cover officer means that you are in charge of officer safety, so he was focused on taking in his surroundings while his partner was speaking to the male and female.

{¶58} Finally, Moreland testified in his own defense. Moreland testified that he resided at the Fairbanks Place address in February, along with his significant other, their children, and his brother. He stated that he did not know either the victim or the accomplice and had never met either of them. According to Moreland, he did not know that the accomplice's Jeep was parked at his house on the evening of the robbery until he later learned that the police had towed it from that location. Moreland testified that he was not the individual who appeared on the security footage from MJ's Drive Through. He noted that his brother frequented the convenience store just as much as he did and that he thought his brother had been at the house on the day of the robbery. Although Moreland would not testify that he thought his brother perpetrated the robbery here, he testified that it was "possible" that his brother was the man with the accomplice that evening.

{¶59} Moreland argues that the jury lost its way in convicting him because the weight of the evidence shows that he was not the man who robbed the victim. He notes that none of witnesses who selected him as a person of interest were entirely confident in their identifications, and there was no evidence that he knew either the victim or the accomplice. He further notes that his DNA was never found inside the accomplice's vehicle. According to Moreland, the victim's description of his assailant was more suited to his brother.

{¶60} Having reviewed the record, we cannot conclude that the jury lost its way when it determined that Moreland perpetrated the robbery here. "As with any other element, * * * identity may be proved by direct or circumstantial evidence, which do not differ with respect to probative value." *State v. Taylor*, 9th Dist. Summit No. 27273, 2015-Ohio-403, ¶ 9. The jury heard testimony that the accomplice picked up a black male at Moreland's address and that the police found her Jeep parked there later that evening. Moreover, they heard testimony from three individuals who identified Moreland as the man who was with the accomplice that evening. The victim chose Moreland's photo out of an array and also identified him in court as the man who robbed him. The manager of MJ's Drive Through testified that Moreland was a daily customer at his store and identified him in court as the man captured on his store's security footage. Officer Manzo selected Moreland's photo out of an array at a 70% confidence level and also identified him in court as the man to whom he spoke at Fairbanks Place on the evening of the robbery. Although Moreland presented some evidence that he was not the individual who perpetrated the robbery and that his brother might have been involved instead, the jury ultimately chose to believe the State's evidence over Moreland's.

{¶61} "This Court has repeatedly held that the trier of fact is in the best position to determine the credibility of witnesses and evaluate their testimony accordingly." *State v.*

*Johnson*, 9th Dist. Summit No. 25161, 2010-Ohio-3296, ¶ 15. We "will not overturn a conviction as being against the manifest weight of the evidence simply because the trier of fact chose to believe the State's version of events over another version." *State v. Barger*, 9th Dist. Medina No. 14CA0074-M, 2016-Ohio-443, ¶ 29. Because Moreland has not shown that this is the exceptional case where the jury lost its way by convicting him, we reject his argument that his conviction is against the manifest weight of the evidence. *See Otten*, 33 Ohio App.3d at 340. His third assignment of error is overruled.

## ASSIGNMENT OF ERROR IV

THE TRIAL COURT COMMITTED PLAIN ERROR BY IMPOSING A VAGUE RESTITUTION ORDER UPON MORELAND WITHOUT PREVIOUSLY HOLDING A HEARING, REQUIRING REMAND FOR RESENTENCING.

**{¶62}** In his fourth assignment of error, Moreland argues that the trial court erred when it imposed a vague restitution order. He argues that this matter should be remanded for resentencing because the court included a restitution order in its sentencing entry without addressing the matter of restitution in open court.

**{¶63}** Upon review, we do not agree that the court ordered Moreland to pay restitution. The court did not discuss restitution at Moreland's sentencing hearing, and his sentencing entry is devoid of any such order or reference to a specific amount of restitution. The only portion of the sentencing entry that contains a reference to restitution reads as follows:

Defendant is to pay the costs of this prosecution and judgment is granted against the Defendant in favor of the County of Summit for the court costs; said monies to be paid to the Summit County Clerk of Courts * * *. The Summit County Clerk of Courts shall collect monies from the Defendant in the following order of priority: (1) restitution; (2) court costs and Adult Probation Department fees; (3) fines, if applicable.

The court, therefore, only included restitution as part of the general list it set forth, prioritizing certain payments to the Clerk of Courts. Because the court did not order restitution in this matter, it appears that it simply neglected to remove restitution from the foregoing list of items. Moreland has not shown how he was prejudiced by the court's superfluous reference to restitution, given that he was not ordered to pay it. Accordingly, the court's error, if any, was harmless, and we decline to remand this matter for resentencing. *See State v. Sturgell*, 9th Dist. Summit No. 26618, 2013-Ohio-3518, ¶ 10; *State v. Crowell*, 9th Dist. Wayne No. 10CA0005, 2010-Ohio-6245, ¶ 34. Moreland's fourth assignment of error is overruled.

## ASSIGNMENT OF ERROR V

MORELAND'S TRIAL COUNSEL WAS INEFFECTIVE, THEREBY DEPRIVING HIM OF THE ASSISTANCE OF COUNSEL GUARANTEED HIM BY THE SIXTH AMENDMENT.

{¶64} In his fifth assignment of error, Moreland argues that he received ineffective assistance of counsel. Because Moreland's argument involves several different aspects of his counsel's performance, we separately address each alleged instance of ineffective assistance.

{¶65} In order to prevail on a claim of ineffective assistance of counsel, Moreland must show that his "counsel's performance fell below an objective standard of reasonableness and that prejudice arose from counsel's performance." *State v. Reynolds*, 80 Ohio St.3d 670, 674 (1998), citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland* at 686. Thus, a two-prong test is necessary to examine such claims. First, Moreland must show that counsel's performance was objectively deficient by producing evidence that counsel acted unreasonably. *State v. Keith*, 79 Ohio St.3d 514, 534 (1997), citing

*Strickland* at 687. Second, Moreland must demonstrate that but for counsel's errors, there is a reasonable probability that the results of his trial would have been different. *Keith* at 534.

**Alibi Notice**

{¶66} Moreland first argues that he was deprived of the effective assistance of counsel because his counsel never filed a timely notice of alibi. This Court discussed Moreland's alibi in disposing of his first assignment of error. As previously noted, Moreland's proffered alibi was that he spent the entire day of the robbery with his significant other, that the two went to a recording studio, and that they later got a hotel room to celebrate Valentine's Day. On the morning of trial, defense counsel informed the court that he had just discovered, within the past few days, that there were witnesses who could place Moreland at a recording studio on the day of the robbery. In refusing to allow Moreland to present alibi testimony, the court made the following statements to defense counsel:

> I am not going to allow a continuance of the trial to permit an alibi that is being raised on the morning of trial to be investigated, nor am I going to allow alibi testimony when the alibi information would have been in the possession of [Moreland] for now approximately three months.
>
> * * *
>
> The Court recognizes that you may have gotten this information within the last seven days; so, this is not a situation, as I see it, where you have fallen down on your duty to investigate or file a notice, and while the Court can, in its discretion, and in the interest of justice, permit alibi testimony, even when the notice is not filed, I haven't heard any reason to substantiate the Court allowing that to occur; so, that will not be permitted.

Accordingly, the trial court specifically found that it did not appear to be any failings on the part of defense counsel that had caused Moreland's alibi not to be timely asserted.

{¶67} Moreland has not shown that his counsel's performance fell below an objective standard of reasonableness. *See Reynolds*, 80 Ohio St.3d at 674. Defense counsel could not timely file a notice of alibi if Moreland never gave him the information that served as his alibi.

*See State v. Perry*, 9th Dist. Lorain No. 00CA007634, 2001 WL 123462, \*2 ("The fact that [the defendant] chooses to wait almost three months before sharing his alibi with defense counsel can not be considered defense counsel's deficient performance."). As set forth above, the record does not support the conclusion that any initial confusion about the time of the robbery here persisted until the eve of trial. Moreland could have informed his counsel at any time that he spent the entire day of the robbery with his significant other and that she was willing to testify to that effect. Had he done so, defense counsel could have filed a timely notice of alibi. The record does not support Moreland's argument that he received ineffective assistance of counsel on this basis.

**Lack of Authentication/Foundation**

**{¶68}** Next, Moreland argues that he received ineffective assistance of counsel because his counsel failed to lay a proper foundation for two exhibits: (1) a screen shot of the accomplice's Facebook page; and (2) the accomplice's cell phone records. Moreland argues that he was prejudiced by the foregoing exhibits being kept from the jury because they would have shown that he was not the accomplice's friend and did not have contact with her.

**{¶69}** We previously addressed the screen shot of the accomplice's Facebook page in reviewing Moreland's first assignment of error. There, we determined that Moreland could not show prejudice as a result of the screen shot's exclusion because Detective Garro specifically testified that he never found a "friend link" between Moreland and the accomplice on the accomplice's Facebook page. We reach the same conclusion in the assignment of error at hand. Because Moreland cannot demonstrate prejudice in light of Detective Garro's testimony, his ineffective assistance argument must likewise fail. *See Keith*, 79 Ohio St.3d at 534.

{¶70} As for the accomplice's cell phone records, the court would not allow Moreland's counsel to question Detective Garro about their contents because he did not subpoena anyone from the phone company to authenticate them. Moreland argues that he was prejudiced by his counsel's failure to do so because the records would have shown that there was no phone contact between him and the accomplice on the day of the robbery. Even assuming that defense counsel's performance fell below an objective standard of reasonableness, however, Moreland has not shown that the records, had they been introduced, would have changed the result in this matter. *See id.* The police discovered the accomplice's car parked in Moreland's driveway immediately following the robbery. They also heard testimony from three separate individuals that Moreland was the man seen with the accomplice that evening. Accordingly, even if the jurors heard evidence tending to show that the accomplice and Moreland did not have phone contact on the day of the robbery, they still could have concluded that Moreland perpetrated the robbery here. We reject Moreland's argument that his counsel's failure to secure the admission of the phone records affected the outcome of his trial.

**Visible Handcuffs**

{¶71} Next, Moreland argues that he received ineffective assistance of counsel because his counsel failed to ensure that he maintained his presumption of innocence. He argues that, after learning that several jurors may have seen him in handcuffs, his counsel failed to move for a mistrial, ask for a curative instruction, or remind the court to ask the jurors about the encounter. According to Moreland, he was prejudiced by his counsel's failure to take action here because the jurors may have been tainted by their view of him in handcuffs.

{¶72} Following a break that occurred during voir dire, the trial judge was informed that Moreland had been brought in past several jurors while wearing handcuffs. Defense counsel

stated that he was not aware of the incident because Moreland had not mentioned it. The prosecutor, however, stated that there was a piece of paper over Moreland's hands at the time, so they were covered. The following exchange then took place:

> THE COURT: That's acceptable. We try to avoid that, but, [defense counsel], what I would like to do at some point on a break is inquire of [Moreland] as to whether he thinks his handcuffs were seen by anyone and then you can advise the Court whether you wish any kind of a cautionary instruction be given.
>
> [DEFENSE COUNSEL]: We can get a new panel?
>
> THE COURT: No, we can't just get a new panel. There's no reason to based on what I heard so far.

No additional discussions about the handcuffs appear in the record. Accordingly, it is not clear whether the court later spoke to Moreland about the handcuffs.

{¶73} Moreland claims that he received ineffective assistance of counsel because his counsel did not take further action regarding the fact that several jurors may have seen him in handcuffs. The record does not evidence, however, whether additional discussions about the handcuffs occurred. To demonstrate that additional discussions did not, in fact, occur, Moreland would have to rely on evidence outside the record. Accordingly, to that extent, his argument is more suited to post-conviction relief. *See State v. Moffett*, 9th Dist. Summit No. 28001, 2016-Ohio-5314, ¶ 11.

{¶74} To the extent the record contains information about Moreland having been seen in handcuffs, the prosecutor assured the court that Moreland's hands were covered by a piece of paper. Moreover, the incident occurred during voir dire, so it is not clear that the potential jurors who saw Moreland ultimately became members of his jury. Even assuming that one or more eventual jurors caught a brief glimpse of Moreland in restraints, the incident was brief, inadvertent, and occurred when trial was not yet in session. *See State v. Halsell*, 9th Dist. Summit No. 24464, 2009-Ohio-4166, ¶ 7, quoting *State v. Kidder*, 32 Ohio St.3d 279, 286

(1987) ("When a jury's view of the defendant in restraints is 'brief, inadvertent, and outside the courtroom,' there is but a slight risk of prejudice."). Counsel may well have determined that a motion for mistrial would fail or that a curative instruction would draw more unwanted attention to the incident. *See State v. Barger*, 9th Dist. Medina No. 14CA0074-M, 2016-Ohio-443, ¶ 42 ("Counsel's strategic or tactical decisions will not form the basis of an ineffective assistance of counsel claim."). Upon review, we cannot conclude that Moreland has shown that his counsel's performance fell below an objective standard of reasonableness or that he suffered any prejudice as a result. *See Reynolds*, 80 Ohio St.3d at 674.

**New Trial Motion**

**{¶75}** Lastly, Moreland argues that he received ineffective assistance of counsel because his counsel failed to adequately support his motion for a new trial. Moreland moved for a new trial because he learned that, during voir dire, one of the jurors failed to disclose that she had been robbed several times in the past. His counsel attached to the motion his own affidavit. In his affidavit, counsel averred that he had spoken to one of the jurors and that the juror with whom he had spoken told him that one of the other jurors "disclosed that she was robbed a couple of times in the past and that she sympathized with the witness who claimed to be robbed * * *." Defense counsel further averred that the juror had not disclosed in voir dire that she was a victim of robbery. The trial court primarily rejected Moreland's motion for new trial because of the evidence aliunde rule.

**{¶76}** "Juror testimony is generally not admissible to impeach a jury verdict unless there is supporting evidence aliunde. Evidence aliunde is extraneous, independent evidence of alleged conduct based on the firsthand knowledge of one who is not a juror." (Internal citations omitted.) *State v. Penix*, 9th Dist. Summit No. 23699, 2008-Ohio-1051, ¶ 38. Moreland argues

that, had his counsel attached evidence aliunde to his motion for new trial, the trial court may have scheduled a hearing to receive additional evidence on the juror's alleged misconduct. He offers, as an example, that his counsel could have found "a police report showing that the offending juror had been a crime victim."

**{¶77}** Moreland's argument is speculative at best. It is not clear that his counsel was even able to determine which female juror had allegedly been a crime victim. Even assuming his counsel could have uncovered that information, however, he may not have been able to find any extraneous information to evidence that the juror had, in fact, been robbed several times in the past. "[S]peculation regarding the prejudicial effects of counsel's performance will not establish ineffective assistance of counsel." *State v. Buzek*, 9th Dist. Medina No. 14CA0011-M, 2015-Ohio-4416, ¶ 7, quoting *State v. Zupancic*, 9th Dist. Wayne No. 12CA0065, 2013-Ohio-3072, ¶ 4. Upon review, we reject Moreland's argument that he received ineffective assistance of counsel. Consequently, his fifth assignment of error is overruled.

### III.

**{¶78}** Moreland's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

DONNA J. CARR
FOR THE COURT

WHITMORE, J.
SCHAFER, J.
CONCUR.

APPEARANCES:

JACQUENETTE S. CORGAN, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.