[Cite as *State v. Taylor*, 2019-Ohio-3253.]

| | | | |
|---|---|---|---|
| STATE OF OHIO | ) | | IN THE COURT OF APPEALS |
| | )ss: | | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | | |

STATE OF OHIO

    Appellee

v.

MARTIGUS CARMEL TAYLOR

    Appellant

C.A. No.     29058

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.    CR-2017-11-3961

DECISION AND JOURNAL ENTRY

Dated: August 14, 2019

---

TEODOSIO, Presiding Judge.

**{¶1}** Appellant, Martigus C. Taylor, appeals from his convictions in the Summit County Court of Common Pleas. This Court affirms.

I.

**{¶2}** Mr. Taylor and the victim ("C.D.") were in an on-and-off relationship over the span of several years. The relationship had ended in June of 2017, yet Mr. Taylor visited C.D. at her home in Akron on the night of October 26, 2017, despite the existence of a civil protection order ("CPO") against him. C.D. allowed Mr. Taylor into her home, but the two soon began arguing over Mr. Taylor's allegations of C.D.'s sexual involvement with a minor. At some point, the two engaged in sexual intercourse. A physical altercation later occurred, in which C.D. sustained various injuries, and the police were called to the scene.

**{¶3}** Following a jury trial, Mr. Taylor was found guilty of domestic violence, a felony of the third degree, and violating a protection order, a misdemeanor of the first degree. The trial

court ordered a pre-sentence investigation report with victim impact statement. The court later sentenced Mr. Taylor to two years in prison for domestic violence and 180 days in jail for violating a protection order, to be served concurrently with each other.

{¶4} Mr. Taylor appeals from his convictions and raises two assignments of error for our review. For ease of analysis, we will reorganize his assignments of error.

II.

**ASSIGNMENT OF ERROR TWO**

APPELLANT'S CONVICTION OF DOMESTIC VIOLENCE WAS AGAINST
THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶5} In his second assignment of error, Mr. Taylor argues that his domestic violence conviction was against the manifest weight of the evidence. We disagree.

{¶6} This Court has stated:

In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). "[W]hen reversing a conviction on the basis that it was against the manifest weight of the evidence, an appellate court sits as a 'thirteenth juror,' and disagrees with the factfinder's resolution of the conflicting testimony." *State v. Tucker*, 9th Dist. Medina No. 06CA0035-M, 2006-Ohio-6914, ¶ 5. This discretionary power "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). *See also Otten* at 340.

{¶7} Because Mr. Taylor has not challenged his conviction for violating a protection order, we will accordingly focus our analysis solely on his conviction for domestic violence. Mr. Taylor was convicted of domestic violence under R.C. 2919.25(A), which states: "No person shall knowingly cause or attempt to cause physical harm to a family or household member." Because Mr. Taylor had previously been convicted of two other offenses of domestic violence, the offense in this matter was enhanced to a felony of the third degree. R.C. 2919.25(D)(4). "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B). "'Physical harm to persons' means any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3). A "family or household member" includes a person living as a spouse who has resided with the offender. R.C. 2919.25(F)(1)(a)(i). A "person living as a spouse" includes a person who "has cohabited with the offender within five years prior to the date of the alleged commission of the act in question." R.C. 2919.25(F)(2).

{¶8} Mr. Taylor testified at trial and admitted that he had two previous convictions for domestic violence, and the State entered journal entries of those convictions into evidence. C.D. testified at trial that Mr. Taylor was an "off and on" boyfriend of hers for the past five years and the two had lived together at her home in Akron at certain points during the relationship. She testified that Mr. Taylor showed up at her home on the night of October 26, 2017, around 10:00 P.M., despite an active CPO she had obtained against him. They spoke to each other cordially outside and she soon invited him inside because, according to C.D., they had "a lot of history" together, she missed him, and "sometimes you can't help who you love."

{¶9} C.D. claimed the conversation inside soon escalated into an argument, as Mr. Taylor began accusing her of attending his friend's birthday party and "ha[ving] an orgy with her

daughter * * *." According to C.D., Mr. Taylor also sought to have sexual intercourse with her at some point, but she instead simply wished to "cuddle, lay down[,] and just chill" because she was tired. She testified that Mr. Taylor then threatened to call the police and Children Services Board ("CSB") to have her sent to jail, and "basically forced [her] * * * to have sex with him." Contrarily, Mr. Taylor testified at trial that it was C.D. who initiated the sexual encounter, and asserted that he did not force or coerce her into having sex with him. He claimed that afterward she admitted to the allegations of having sex with a minor, and he began to ridicule her for it. Mr. Taylor agreed that he told C.D. he was going to call the police and CSB and told her he hoped she would go to jail.

{¶10} According to C.D., Mr. Taylor began talking about some cameras he believed were set up in her home and told her to "produce" one. When she was unable to do so, she testified "that's when the punching started." Mr. Taylor would only give her "so much time" e.g., five or ten minutes to search for and find a camera, and when she could not produce one "that was a punch." She testified that, altogether, Mr. Taylor punched her six times in the face as punishment. According to C.D., Mr. Taylor took a novelty baseball bat of hers and began "punching [her] in the head" with the "handle" or "bottom part" of it. While distraught and searching for a camera in the kitchen to appease him, C.D. pushed over the kitchen table, which made a loud noise. She testified that Mr. Taylor then accused her of "trying to make noise" to "bring attention" to the two of them, so he swung the bat and hit her three times on the arm and in the head with it.

{¶11} Mr. Taylor, however, testified that after he told C.D. he was going to call both the police and CSB she grabbed a baseball bat and threatened him with it. She then hit him with the bat, but he managed to "snatch[]" it from her. He admitted to "poking" her in her midsection

with the bat, but claimed she then brandished a knife and threatened to cut him or kill him. Both parties agreed that C.D. was naked throughout the encounter, and Mr. Taylor was unable to say where she obtained the knife. He testified that he raised the bat up and said, "Shut up and leave me alone." He conceded that he "[d]rew back like he was going to hit her[,]" but claimed he never hit her with it, or punched her or kicked her, as she instead ran out the back door.

{¶12} C.D. testified that she escaped out the back door after Mr. Taylor returned to the living room. Mr. Taylor came after her, however, and "tried to drag [her] back into the house." C.D. claimed she was kicking and screaming, and Mr. Taylor punched her one last time. Mr. Taylor testified that, when C.D. ran out the back door, she missed her step and he saw her fall down "face first" on the concrete slab, and he heard a "smack[.]"

{¶13} C.D. testified that Mr. Taylor ran back into her home when a neighbor appeared. She did not believe the neighbor ever saw Mr. Taylor. She testified that the neighbor called the police while C.D. was on the floor "bleeding everywhere and crying * * *." C.D. admitted initially lying to the police at the scene by claiming Mr. Taylor snuck into her home while she was cleaning up or taking out the garbage. She testified that she lied because she did not want to get in trouble for letting Mr. Taylor into her home when she had an active CPO against him.

{¶14} C.D. testified that she suffered several injuries during the incident, including scars, abrasions, swelling, bruises, and a bloody nose. She claimed that she never fought back against Mr. Taylor because she was terrified of him. Officer Nathan Stuyvesant of the Akron Police Department testified that he responded to the scene and spoke to C.D., who told him that her on-again off-again boyfriend came into her home and assaulted her. The officer took photographs of C.D.'s injuries and the inside of her home, which were entered into evidence, and he testified that he observed some bleeding on the inside of her lip, swelling, and some scratches.

Dustin Willoughby, a firefighter and paramedic for the Akron Fire Department, testified that he responded to the scene and observed C.D.'s injuries, which included minor swelling in her upper lip and tenderness upon the touching of her head. C.D. also reported to Mr. Willoughby some pain in her "right flank area" and right arm.

{¶15} Although C.D. and Mr. Taylor presented conflicting stories at trial as to what occurred on the night of October 26th and morning of October 27th, we do not agree with Mr. Taylor's assertion that he presented a "plausible explanation" for C.D.'s injuries, while C.D.'s explanation was "extremely dubious." "'[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts.'" *State v. Haydon*, 9th Dist. Summit No. 27737, 2016-Ohio-4683, ¶ 28, quoting *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. Thus, we cannot say the jury erred in choosing to believe C.D.'s version of events over Mr. Taylor's, as the jury was best able to view the witnesses and observe their demeanor, gestures, and voice inflections, and use those observations in weighing the credibility of the proffered testimony. *See State v. Cook*, 9th Dist. Summit No. 21185, 2003-Ohio-727, ¶ 30. This Court has consistently held that "[w]e will not overturn a conviction as being against the manifest weight of the evidence simply because the trier of fact chose to believe the State's version of events over another version." *State v. Fry*, 9th Dist. Medina No. 16CA0057-M, 2017-Ohio-9077, ¶ 13.

{¶16} In reviewing the entire record, weighing the evidence and all reasonable inferences, and considering the credibility of witnesses, we cannot say that the trial court, in resolving any conflicts in the evidence, clearly lost its way and created a manifest miscarriage of justice. *See Otten* at 340. Mr. Taylor has also not demonstrated how this is an exceptional case

where the evidence presented weighs heavily in his favor and against conviction. *See Thompkins* at 387.

{¶17} Mr. Taylor's second assignment of error is overruled.

## ASSIGNMENT OF ERROR ONE

THE TRIAL COURT ERRED WHEN IT FAILED TO ORDER A MISTRIAL AFTER THE STATE ELICITED PREJUDICIAL AND INADMISSIABLE (SIC) EVIDENCE THAT APPELLANT FORCED (RAPED) THE ALLEGED VICTIM TO HAVE SEX. THE TRIAL COURT'S ERROR DEPRIVED MR. TAYLOR OF DUE PROCESS AND A FAIR TRIAL * * *.

{¶18} In his first assignment of error, Mr. Taylor argues that the trial court erred when it denied his motion for a mistrial following the victim's testimony that Mr. Taylor forced her to have sex with him. We disagree.

{¶19} There are no exact standards to apply in evaluating whether a trial court should declare a mistrial in any particular case. *State v. Hickman*, 9th Dist. Summit No. 27321, 2015-Ohio-4668, ¶ 21. "Mistrials need be declared only when the ends of justice so require and a fair trial is no longer possible." *State v. Franklin*, 62 Ohio St.3d 118, 127 (1991). "'In analyzing whether a defendant was deprived of a fair trial, an appellate court must determine whether, absent the improper remarks, the jury would have found the appellant guilty beyond a reasonable doubt.'" *State v. Allgood*, 9th Dist. Lorain No. 17CA011224, 2019-Ohio-738, ¶ 24, quoting *Columbus v. Aleshire*, 187 Ohio App.3d 660, 2010-Ohio-2773, ¶ 42 (10th Dist.). Thus, "[t]he essential inquiry on a motion for a mistrial is whether the substantial rights of the accused are adversely affected." *Wadsworth v. Damberger*, 9th Dist. Medina No. 3024-M, 2000 WL 1226620, *2 (Aug. 30, 2000).

{¶20} Because the trial court is in the best position to determine whether the declaration of a mistrial is warranted under the circumstances as they have arisen in the courtroom, we

afford great deference to the trial court's decision and will not second-guess such a determination absent an abuse of discretion. *State v. Edwards*, 9th Dist. Summit No. 28164, 2017-Ohio-7231, ¶ 12. "The term 'abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). When applying an abuse of discretion standard, a reviewing court is precluded from simply substituting its own judgment for that of the trial court. *Pons v. Ohio State Med. Bd.*, 66 Ohio St.3d 619, 621 (1993).

{¶21} During her testimony at trial, C.D. made a surprise revelation to both the defense and the State when she said that Mr. Taylor "basically forced [her] * * * to have sex with him." At sidebar, defense counsel objected to the introduction of any testimony that Mr. Taylor "raped" C.D. and asked the court to strike the remark from the record. The trial court did not strike the remark, but told the prosecutor to not ask the witness any further questions about it. The prosecutor asserted that C.D. never mentioned rape to her before and Mr. Taylor was likewise not charged with it. During cross-examination as to this new revelation, C.D. admitted that she had not mentioned any forced sex to the police, but claimed that she mentioned forced sex the first or second time she met the prosecutor. At sidebar again, defense counsel moved for a mistrial because the defense was "ambushed" with this "unbelievably prejudicial" testimony. The court denied the motion and stated that the prosecutor never questioned C.D. about Mr. Taylor forcing himself on her, but C.D. offered that testimony on her own, and cross-examination is the remedy for that. The court also later denied defense counsel's request to call the prosecutor to the witness stand.

{¶22} After reviewing the entire record, we cannot say that C.D.'s brief, isolated comment that Mr. Taylor forced her to have sex that night denied Mr. Taylor a fair trial to the

point that the jury would have acquitted him but for the remark, warranting a mistrial. Defense counsel aggressively challenged C.D.'s credibility by cross-examining her on the issue, and she admitted that she never told the police Mr. Taylor forced himself on her. Counsel further elicited testimony from both Officer Stuyvesant and Mr. Willoughby that C.D. never told either of them she had been raped. The jury was permitted to determine and weigh C.D.'s credibility when presented with this contradictory testimony as to whether Mr. Taylor forced her to have sex with him. *See State v. Keller*, 8th Dist. Cuyahoga No. 106196, 2018-Ohio-4107, ¶ 55.

{¶23} Furthermore, even without C.D.'s unsolicited, fleeting remark as to the nature of their sexual encounter that night, the State presented overwhelming evidence that Mr. Taylor committed several acts of domestic violence. C.D. testified that Mr. Taylor punched her six times in the face, hit her in both the head and arm with a baseball bat, and later punched her one final time. While Mr. Taylor's version of the events differed substantially, as he claimed he never punched, kicked, or hit her with the bat  instead claiming she fell onto some concrete on her own  he still admitted to grabbing the bat and "poking" her with it. C.D., a police officer, and a firefighter/paramedic all testified as to C.D.'s injuries, and the photographs revealed visible injuries not inconsistent with C.D.'s version of the events.

{¶24} Accordingly, we cannot agree that the trial court abused its discretion in denying Mr. Taylor's motion for a mistrial. Mr. Taylor's first assignment of error is overruled.

### III.

{¶25} Mr. Taylor's first and second assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

THOMAS A. TEODOSIO
FOR THE COURT

HENSAL, J.
SCHAFER, J.
CONCUR.

APPEARANCES:

JEFFREY N. JAMES, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.