[Cite as *State v. Berila*, 2020-Ohio-3523.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF MEDINA | ) | |

| STATE OF OHIO | C.A. No. 19CA0007-M |
|---|---|
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| SHAWN M. BERILA | COURT OF COMMON PLEAS COUNTY OF MEDINA, OHIO |
| Appellant | CASE No. 17CR0939 |

DECISION AND JOURNAL ENTRY

Dated: June 30, 2020

TEODOSIO, Judge.

{¶1}   Appellant, Shawn M. Berila, appeals from his convictions for gross sexual imposition ("GSI") and rape in the Medina County Court of Common Pleas. This Court affirms.

I.

{¶2}   When the victim ("J.S.") was only seven years old, Mr. Berila married her mother, and the family of three soon moved from a trailer into a house in Seville. By all accounts, Mr. Berila was a very strict disciplinarian through the years as J.S.' step-father. For instance, J.S. would be grounded for months at a time, she was not allowed to get a driver's license until she turned eighteen, and she was not allowed to have a boyfriend.

{¶3}   According to J.S., when she was eleven years old, Mr. Berila began sexually abusing her over the span of a decade, from 2003 to 2013. The first incident occurred sometime in the fall of 2003. Mr. Berila was taking a bath while J.S.' mother was at work, and he summoned J.S. to bring him a drink. After she put his can of Pepsi on the bathroom sink, Mr. Berila called

her over to the bathtub, grabbed her by the hand, forced her hand onto his penis, and told her to grab it. J.S. testified that Mr. Berila began molesting her frequently from that moment on, usually while her mother was at work. He would call her to his bedroom after she got home from school, where he would lay on his bed and make her give him "hand jobs" or "blow jobs" until he ejaculated. Sometimes he would either remove her clothes or have her take off her own clothes, and she felt she had no choice but to comply. The sexual abuse progressed through the years and Mr. Berila began having vaginal intercourse with J.S. when she was sixteen years old. He would put her on his bed and force himself inside of her while holding her down. She sometimes tried to resist and sometimes cried, but he was much stronger and she realized her efforts were futile. It became such a normal routine for J.S. that when Mr. Berila would tell her to go to his bedroom she would sometimes just take off her clothes while waiting for him because she "knew it was going to happen anyway * * *." J.S. never told anyone because Mr. Berila showed her his gun and threatened to "kill [them] all if [she] told anybody." Mr. Berila admitted he bought a gun for protection in the event his father showed up at the house. Mr. Berila's father was being released after serving a lengthy prison term for sexually abusing Mr. Berila's sister and attempting to sexually abuse Mr. Berila's brother sometime in the 1970's.

{¶4} According to J.S., Mr. Berila impregnated her when she was nineteen years old, but they told her mother that the father of the child was a random guy at a party. Her parents insisted that she get an abortion against her wishes, although at trial Mr. Berila claimed to have actually opposed the abortion. J.S. recalled that the sexual assaults continued after the abortion, albeit not as often. When she was hospitalized following threats of suicide, her mother recalled Mr. Berila being there "every possible second" for visiting hours. A doctor noted in J.S.' medical records that during his interview with her, Mr. Berila was overly concerned, talked over J.S., and overtook

the interview. Her mother recalled Mr. Berila being "pissed" at one point when a nurse admonished him for climbing into the hospital bed with J.S. and placing his arm around her, which incident was also noted by the nurse in J.S.' medical records.

{¶5} During a family vacation to Cancun, Mexico, in 2014, the family had two queen-sized beds in their hotel room, yet Mr. Berila decided to sleep in J.S.' bed with her for several nights, although the actual number of nights was disputed. He claimed there was no room in the other bed, as he wanted to give her sunburnt mother some space. J.S. recalled Mr. Berila telling her he felt like they were in a relationship, but at trial he denied making this remark. Her mother recalled that Mr. Berila would take many pictures of J.S. and would position himself close to her in the pictures.

{¶6} In late 2014, J.S. moved out of the family house. According to her mother, Mr. Berila was very upset and heartbroken when J.S. moved out, and "he said it was like she had broke (sic) up with him." Mr. Berila admitted being emotionally distraught at the time, but only recalled saying "it was like losing [their] daughter" or "like she was leaving [them]." The mother claimed Mr. Berila was so upset that he attempted suicide by taking several Vicodin pills. Mr. Berila denied attempting suicide, but conceded he may have taken Vicodin for neck pain. J.S. met and began dating a boyfriend ("A.S.") sometime that same year. She recalled revealing the sexual abuse to A.S. in 2015, which he corroborated at trial, but she refused his advice to tell her mother because she was still scared and not ready to tell her. When she began to miss her mother and later asked about returning home to live, her mother said yes, but Mr. Berila said no. J.S.' mother divorced Mr. Berila sometime thereafter and moved into her own apartment.

{¶7} Sometime in 2016, J.S. broke up with A.S. and met a new boyfriend ("J.H."). After J.H. decided to move to Florida, J.S. attempted suicide by ingesting five ibuprofen pills and seven

Advil pills and making superficial cuts to her left wrist. She was hospitalized again and revealed to staff that Mr. Berila not only sexually abused her, but was also the father of her aborted child. Afterward, she made eleven visits to a counselor and revealed the sexual abuse to her as well.

{¶8} In early 2017, when J.S. was twenty-four years old, she texted her grandmother and revealed Mr. Berila's sexual abuse. The police were soon contacted and they launched an investigation. The police had J.S. send some "controlled texts" to Mr. Berila asking to talk with him, but Mr. Berila refused to talk to J.S. via text or over the phone. He texted back that he would only agree to meet with her in person. The police never set up an actual meeting, however, once they learned J.S.' mother had revealed her daughter's sexual abuse allegations to a co-worker. Two officers then went to Mr. Berila's home and told him they had some questions about his step-daughter. According to Officer Joshua Thompson, Mr. Berila seemed nervous and surprised, and he told them he would prefer to talk with them at the nearby police station. Although the police station was not even one mile away, Officer Thompson recalled that Mr. Berila showed up thirty minutes later, appeared "real (sic) shaken up," and smelled strongly of cigarettes, as if he had smoked an entire pack. Mr. Berila explained that he called his brother and his attorney during that time.

{¶9} Mr. Berila was indicted on one count of gross sexual imposition ("GSI") in violation of R.C. 2907.05(A)(4), six counts of rape in violation of R.C. 2907.02(A)(1)(b), and twenty-four counts of rape in violation of R.C. 2907.02(A)(2).

{¶10} Many months later, but prior to trial, J.S. remembered that Mr. Berila, who had a hobby of photography, had taken nude pictures of her at some point. She informed the prosecutor, and the police obtained a search warrant for Mr. Berila's home. When they arrived at his home to execute the warrant, Officer Thompson recalled that Mr. Berila no longer appeared nervous, but

seemed rather "cocky" instead. No illicit pictures of J.S. were ultimately discovered in the house. However, police located keyboards and monitors that presumably went to two unaccounted-for desktop computers. Mr. Berila admitted at trial that, while remodeling the home sometime prior to the execution of the search warrant, he threw out two desktop computers that had been in the house for years; one of which was his personal "gaming" computer.

{¶11} The matter proceeded to a jury trial, where Mr. Berila was convicted of all thirty-one counts in the indictment. The trial court ordered a pre-sentence investigation report ("PSI") and later sentenced Mr. Berila to four years in prison for GSI (Count 1), life in prison with parole eligibility after ten years for each of the six R.C. 2907.02(A)(1)(b) rapes (Counts 2 through 7), and a mandatory nine years in prison for each of the twenty-four R.C. 2907.02(A)(2) rapes (Counts 8 through 31). The court ordered Counts 2 through 7 to run concurrently with each other, but consecutively to Count 1, Counts 8 through 25, and Counts 26 through 31. Counts 8 through 25 were run concurrently with each other, but consecutively to Count 1. Counts 26 through 31 were run concurrently with each other, but consecutively to Count 1 and Counts 8 through 25. The court also classified Mr. Berila as a Tier III sex offender.

{¶12} Mr. Berila now appeals from his convictions and raises five assignments of error for this Court's review.

II.

**ASSIGNMENT OF ERROR ONE**

THE EVIDENCE WAS INSUFFICIENT TO SUPPORT THE JURY VERDICTS OF GUILTY.

**ASSIGNMENT OF ERROR TWO**

APPELLANT'S CONVICTIONS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

**{¶13}** In his first and second assignments of error, Mr. Berila argues that his convictions were not supported by sufficient evidence and were against the manifest weight of the evidence. We disagree with both propositions.

**{¶14}** Sufficiency and manifest weight are two separate, legally distinct arguments, and Mr. Berila indeed argues them separately in his merit brief. *See State v. Vincente-Colon*, 9th Dist. Lorain No. 09CA009705, 2010-Ohio-6242, ¶ 20. Nevertheless, aside from setting forth the respective standards of review and his conclusions under each assignment of error, the core paragraphs containing his arguments under both assignments of error are identical—word-for-word. *See, e.g., State v. Powell*, 9th Dist. Lorain No. 12CA010284, 2014-Ohio-63, ¶ 20. As such, we have consolidated these two assignments of error to facilitate our review.

**{¶15}** Whether a conviction is supported by sufficient evidence is a question of law, which this Court reviews de novo. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). "'The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *Id.*, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. We do not, however, resolve evidentiary conflicts or assess the credibility of witnesses, because these functions belong to the trier of fact. *State v. Hall*, 9th Dist. Summit No. 27827, 2017-Ohio-73, ¶ 10.

**{¶16}** When reviewing a manifest weight challenge,

an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). "[W]hen reversing a conviction on the basis that it was against the manifest weight of the evidence, an appellate court sits as a 'thirteenth juror,' and disagrees with the factfinder's resolution of the conflicting testimony." *State v. Tucker*, 9th Dist. Medina No. 06CA0035-M, 2006-Ohio-6914, ¶ 5. This discretionary power "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). *See also Otten* at 340.

{¶17} Mr. Berila was convicted of one count of GSI under R.C. 2907.05(A)(4), which states: "No person shall have sexual contact with another, not the spouse of the offender [or] cause another, not the spouse of the offender, to have sexual contact with the offender [when the] other person * * * is less than thirteen years of age, whether or not the offender knows the age of that person." "Sexual contact" includes "any touching of an erogenous zone of another, including without limitation the * * * genitals, * * * for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B). He was also convicted of six counts of rape under R.C. 2907.02(A)(1)(b), which states: "No person shall engage in sexual conduct with another who is not the spouse of the offender * * * when * * * [t]he other person is less than thirteen years of age, whether or not the offender knows the age of the other person." "Sexual conduct" includes (1) vaginal intercourse between a male and female and (2) fellatio between persons regardless of sex. R.C. 2907.01(A). Finally, Mr. Berila was convicted of twenty-four counts of rape under R.C. 2907.02(A)(2), which states: "No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." "A person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender

intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature." R.C. 2901.22(A). "Purpose can be established by circumstantial evidence and may be ascertained from the surrounding facts and circumstances of the case." *North Ridgeville v. Reichbaum*, 112 Ohio App.3d 79, 85 (9th Dist.1996).

{¶18} For the rapes that occurred while J.S. was still a minor, "'[f]orce need not be overt and physically brutal, but can be subtle and psychological. As long as it can be shown that the rape victim's will was overcome by fear or duress, the forcible element of rape can be established.'" *State v. Dasen*, 9th Dist. Summit No. 28172, 2017-Ohio-5556, ¶ 26, quoting *State v. Eskridge*, 38 Ohio St.3d 56, 58-59 (1988). There also exists a coercion inherent in parental authority when a father sexually abuses his child. *Id.*, citing *Eskridge* at 58.

> "Sexual activity between a parent and a minor child is not comparable to sexual activity between two adults with a history of consensual intercourse. The youth and vulnerability of children, coupled with the power inherent in a parent's position of authority, creates a unique situation of dominance and control in which explicit threats and displays of force are not necessary to effect the abuser's purpose."

*Id.*, quoting *Eskridge* at 59.

{¶19} Mr. Berila has not identified which portions of his identical arguments in these two assignments of error relate to sufficiency and which relate to manifest weight. *See State v. Hull*, 9th Dist. Wayne No. 14AP0025, 2015-Ohio-4001, ¶ 21; *State v. Bryant*, 9th Dist. Medina No. 1950, 1991 WL 57234, *3 (Apr. 10, 1991). Apart from bookending his arguments under his first assignment of error with vague, blanket statements of "there was insufficient evidence to support the jury verdicts of guilty" and "[t]he evidence presented at trial was insufficient for the jury to find Appellant guilty[,]" this Court can discern no specific argument attacking the State's evidence in support of certain elements of his crimes. *See State v. Benford*, 9th Dist. Summit No. 25298, 2011-Ohio-564, ¶ 25; App.R. 16(A)(7). The only portion of his argument that even remotely

relates to sufficiency is his statement that, beyond the testimony of J.S., there was "no physical evidence that rape or [GSI] took place." J.S. testified in graphic detail that her step-father, Mr. Berila, sexually abused her often on countless occasions over the course of a decade, and the testimony of the victim in sex offense cases, if believed, is sufficient to support a conviction, even without further corroboration. *See State v. Martucci*, 9th Dist. Summit No. 28888, 2018-Ohio-3471, ¶ 16. Moreover, "[t]he lack of physical evidence in a case where such evidence was unlikely due to the passage of time does not detract from the victim's testimony." *State v. Morris*, 9th Dist. Medina No. 09CA0022-M, 2012-Ohio-6151, ¶ 63 (Carr, J., dissenting).

{¶20} J.S. testified that when she was eleven years old Mr. Berila called her into the bathroom while he was taking a bath and then forced her to grab his penis. Her testimony, if believed, was sufficient to cause a reasonable jury to conclude that all the elements of GSI were proven beyond a reasonable doubt, as Mr. Berila forced his step-daughter, not his spouse, to have sexual contact with him by grabbing his penis when she was less than thirteen years old. *See* R.C. 2907.05(A)(4); R.C. 2907.01(B). The jury could infer from the type, nature, and circumstances of the contact that the touching of Mr. Berila's genitals was for the purpose of sexual arousal or gratification. *State v. Pistawka*, 9th Dist. Summit No. 27828, 2016-Ohio-1523, ¶ 16.

{¶21} After the bathroom incident, but while she was still less than thirteen years old, J.S. testified that Mr. Berila began making her give him "hand jobs" and "blow jobs" frequently. She provided specific details of the sexual abuse, such as Mr. Berila would always ejaculate onto his own stomach, never in her mouth. She also recalled that the incidents almost always occurred on Mr. Berila's bed and while her mother was at work. Her testimony was sufficient to cause a reasonable jury to conclude that all the elements of rape were proven beyond a reasonable doubt,

as Mr. Berila engaged in sexual conduct, i.e., fellatio, with his step-daughter, not his spouse, when she was less than thirteen years old. *See* R.C. 2907.02(A)(1)(b); R.C. 2907.01(A).

{¶22} J.S. further testified that Mr. Berila began forcing her to engage in vaginal intercourse once she turned sixteen years old. She sometimes struggled and cried to no avail when he forced himself on her, as he was much stronger and would hold her arms down. She recalled that the vaginal intercourse would always occur in the same position, with her lying on her back and Mr. Berila on top of her. She also testified that Mr. Berila showed her his gun and said he would kill them all if she told anyone. The sexual abuse became so routine for J.S. that she testified she would sometimes just take off her clothes and wait for Mr. Berila when he told her to go to his room, knowing it was going to happen no matter what. Finally, she testified that Mr. Berila impregnated her when she was nineteen years old, and her parents then made her get an abortion. J.S.' testimony was sufficient to cause a reasonable jury to conclude that all the elements of rape were proven beyond a reasonable doubt, as Mr. Berila purposely compelled her to submit to sexual conduct, i.e., vaginal intercourse, by force or threat of force. *See* R.C. 2907.02(A)(2); R.C. 2907.01(A).

{¶23} This Court will not undertake a more extensive sufficiency analysis when Mr. Berila has not done so himself. *See Powell*, 2014-Ohio-63, at ¶ 20; App.R. 16(A)(7); *Cardone v. Cardone*, 9th Dist. Summit No. 18349, 1998 WL 224934, *8 (May 6, 1998) ("If an argument exists that can support this assignment of error, it is not this [C]ourt's duty to root it out."). Accordingly, upon review of the evidence presented in a light most favorable to the prosecution, we conclude that the State presented sufficient evidence, if believed, to establish that Mr. Berila committed the offenses of GSI and rape. A reasonable jury could have determined that the State proved each and every element of all thirty-one counts beyond a reasonable doubt.

**{¶24}** Mr. Berila's remaining arguments appear to challenge the manifest weight of the evidence. He first challenges J.S.' credibility, arguing that when she was first hospitalized she did not disclose any allegations of sexual assault. It is not uncommon, however, for victims of abuse to delay their reporting. *Powell* at ¶ 17. Here, J.S. testified that when she was a young child Mr. Berila would tell her not to tell anyone about the incidents and she would simply obey her step-father. As she grew older, however, she did not tell anyone because Mr. Berila showed her his gun and told her he would kill them all if she told anyone. When she was first hospitalized, the evidence showed that Mr. Berila was a constant presence at the hospital. J.S.' mother recalled Mr. Berila being there "every possible second" for visiting hours. J.S.' stipulated medical records further revealed specific notes from both a doctor and a nurse that Mr. Berila talked over J.S. and took over the doctor's interview and had to be told not to lie in J.S.' bed with his arm around her. It would not be unreasonable to presume that J.S. neglected to inform hospital staff of Mr. Berila's sexual assaults in light of his overbearing and constant presence during her hospital stay. Mr. Berila also argues that J.S. did not recall revealing any sexual assault allegations during her second hospital stay. However, other evidence showed that J.S. did reveal the sexual assaults to hospital staff as well as her counselor, her boyfriend, and her grandmother.

**{¶25}** Mr. Berila further attempts to discredit J.S. by calling attention to evidence of her multiple hospitalizations, history of mental illness, suicide threats and attempts, use of marijuana, and association with drug dealers and drug users. But, J.S. testified as to frequent sexual assaults at the hands of her own step-father throughout an entire decade of her childhood, along with a pregnancy by her step-father and a forced abortion. Mental health issues and other difficulties in life are not to be unexpected when one is subjected to years of repeated sexual assaults as a child.

The jury was made fully aware of J.S.' issues, and was able to consider them when weighing her credibility.

{¶26} Mr. Berila also directs us to his testimony denying the allegations in this case. He notes that he admitted on the witness stand to being an overstrict disciplinarian, claimed he opposed J.S.' abortion, and would not allow J.S. to move back home after she left. He further entered into evidence some Father's Day cards he received from J.S. during the time period in which these crimes allegedly occurred. The weight to be given the evidence and the credibility of the witnesses, however, are primarily for the trier of the facts. *State v. Haydon*, 9th Dist. Summit No. 27737, 2016-Ohio-4683, ¶ 28; *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. J.S.' testimony remained largely consistent over time, and the jury was permitted to believe her allegations of sexual abuse, as the finder of fact is free to believe all, part, or none of the testimony of each witness. *See State v. Clark*, 9th Dist. Wayne No. 14AP0002, 2015-Ohio-2978, ¶ 24; *Prince v. Jordan*, 9th Dist. Lorain No. 04CA008423, 2004-Ohio-7184, ¶ 35. The jury was further able to believe all, part, or none of Mr. Berila's testimony. *See id.* The jury was able to view the prosecutor's grueling cross-examination of Mr. Berila, in which certain aspects of his testimony seemed to change over time or not make sense at all. The jury was best able to view all of the witnesses and observe their demeanor, gestures, and voice inflections, and use those observations in weighing the credibility of the proffered testimony. *See State v. Taylor*, 9th Dist. Summit No. 29058, 2019-Ohio-3253, ¶ 15. "This Court has consistently held that '[w]e will not overturn a conviction as being against the manifest weight of the evidence simply because the trier of fact chose to believe the State's version of events over another version.'" *Id.*, quoting *State v. Fry*, 9th Dist. Medina No. 16CA0057-M, 2017-Ohio-9077, ¶ 13.

{¶27} Upon review of the entire record, weighing the evidence and all reasonable inferences, and considering the credibility of witnesses, this Court determines that the jury, in resolving any conflicts in the evidence, did not clearly lose its way and create a manifest miscarriage of justice requiring a reversal of Mr. Berila's convictions and a new trial. *See Otten*, 33 Ohio App.3d at 340. Mr. Berila has also not demonstrated that this is an exceptional case in which the evidence weighs heavily against the conviction. *See Thompkins*, 78 Ohio St.3d at 387.

{¶28} Accordingly, Mr. Berila's first and second assignments of error are both overruled.

## ASSIGNMENT OF ERROR THREE

THE TRIAL COURT ERRED WHEN IT SENTENCED APPELLANT TO CONSECUTIVE PRISON TERMS WHEN CLEARLY AND CONVINCINGLY THE RECORD FAIED (SIC) TO SUPPORT ITS FINDINGS.

{¶29} In his third assignment of error, Mr. Berila argues that the trial court erred in imposing consecutive prison terms, as the record did not support the court's findings. Because the record on appeal is incomplete, we must presume regularity and overrule his assignment of error.

{¶30} "[A]n appellate court may vacate or modify a felony sentence on appeal only if it determines by clear and convincing evidence that the record does not support the trial court's findings under relevant statutes or that the sentence is otherwise contrary to law." *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, ¶ 1. *See also* R.C. 2953.08(G)(2). "Clear and convincing evidence is that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 477 (1954).

{¶31} The Supreme Court of Ohio has stated that "[t]rial courts have full discretion to impose a prison sentence within the statutory range and are no longer required to make findings or give their reasons for imposing maximum, consecutive, or more than the minimum sentences."

*State v. Foster*, 109 Ohio St.3d 1, 2006-Ohio-856, paragraph seven of the syllabus. Still, "[i]n order to impose consecutive terms of imprisonment, a trial court is required to make the findings mandated by R.C. 2929.14(C)(4) at the sentencing hearing and incorporate its findings into its sentencing entry, but it has no obligation to state reasons to support its findings." *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, syllabus. R.C. 2929.14(C)(4) provides:

> If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:

> (a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

> (b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

> (c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

{¶32} "[I]f the trial court does not make the factual findings required by R.C. 2929.14(C)(4), then 'a prison term, jail term, or sentence of imprisonment shall be served concurrently with any other prison term, jail term, or sentence of imprisonment imposed * * *.'" *Bonnell* at ¶ 23, quoting R.C. 2929.41(A). A word-for-word recitation of the language of the statute is not required, however, provided the reviewing court can discern that the trial court engaged in the correct analysis and can determine that the record contains evidence to support the findings. *Id.* at ¶ 29. In other words, trial courts are not required to give a "talismanic incantation"

of the words of the statute, provided the necessary findings can be found in the record and are incorporated into the sentencing entry. *Id.* at ¶ 37.

{¶33} When the trial court imposed consecutive sentences in this matter, it made the following findings:

> [T]he [c]ourt finds that consecutive sentences are necessary to protect the public from future crime and to punish the offender. Consecutive sentences are not disproportionate to the seriousness of the offender's conduct or the danger the offender poses to the public, and at least two of the multiple offenses were committed as part of one or more course of conduct and the harm caused by two or more of the multiple offenses was so great that no single prison term for any of the offenses committed adequately reflect the seriousness of the offender's conduct, and the offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by this offender.

These statements mirror the statutory language of R.C. 2929.14(C)(4) and satisfied the trial court's duty to make all of the requisite findings for the imposition of consecutive sentences.

{¶34} Mr. Berila argues that the record does not support these findings. At sentencing, the trial court stated that J.S. suffered serious physical and psychological harm, specifically noting the abortion, which was exacerbated by her age. The court stated that Mr. Berila's relationship with J.S. facilitated the offense and he showed no remorse. The court also specifically relied on the PSI at sentencing, stating: "My review of the [PSI] shows that the Defendant has denied his guilt in the present case and he also denies having a drug and alcohol problem." Nonetheless, the PSI is not in the record before us. *See State v. Vasquez*, 9th Dist. Summit No. 29422, 2019-Ohio-5406, ¶ 7; *State v. Jones*, 9th Dist. Summit Nos. 29206 and 29207, 2019-Ohio-2605, ¶ 9; *State v. Lucas*, 9th Dist. Summit No. 29077, 2019-Ohio-2607, ¶ 15; *State v. McLeod*, 9th Dist. Summit No. 20757, 2002 WL 388909, *2 (Mar. 13, 2002); *State v. Zeffer*, 9th Dist. Summit Nos. 19893 and 19963, 2000 WL 1825092, *8 (Dec. 13, 2000). "It is the appellant's responsibility to ensure that the record on appeal contains all matters necessary to allow this Court to resolve the issues on

appeal." *State v. Farnsworth*, 9th Dist. Medina No. 15CA0038-M, 2016-Ohio-7919, ¶ 16. *See also* App.R. 9. This includes the PSI where appropriate. *McLeod* at *2. "This Court has consistently held that, where the appellant has failed to provide a complete record to facilitate appellate review, we are compelled to presume regularity in the proceedings below and affirm the trial court's judgment." *Farnsworth* at ¶ 16. Because the record before us does not contain the PSI necessary for appellate review, we cannot properly review Mr. Berila's sentence. *See Vasquez* at ¶ 8. The information contained in the PSI was specifically relied upon by the trial court, and without the context it might provide we cannot conclude that there is clear and convincing evidence in the record the sentences are contrary to law. *See State v. Shelton*, 9th Dist. Lorain No. 18CA011368, 2019-Ohio-1694, ¶ 8, citing R.C. 2953.08(G)(2). Accordingly, we must presume regularity in the proceedings below and affirm.

{¶35} Mr. Berila's third assignment of error is overruled.

## ASSIGNMENT OF ERROR FOUR

DEFENDANT-APPELLANT'S TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION.

{¶36} In his fourth assignment of error, Mr. Berila argues that his trial counsel was ineffective in failing to retain a forensic psychologist as an expert witness on his behalf, which he claims "guaranteed his conviction in this case." We disagree.

{¶37} "[I]n Ohio, a properly licensed attorney is presumed competent." *State v. Gondor*, 112 Ohio St.3d 377, 2006-Ohio-6679, ¶ 62. "There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Strickland v. Washington*, 466 U.S. 668, 689 (1984). Moreover, debatable trial tactics will not constitute ineffective assistance of counsel. *State v. Clayton*, 62

Ohio St.2d 45, 49 (1980).  To prove ineffective assistance of counsel, one must establish that: (1) his counsel's performance was deficient, and (2) the deficient performance prejudiced the defense. *Strickland* at 687.  Counsel's performance is deficient if it falls below an objective standard of reasonable representation.  *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph two of the syllabus.  Prejudice can be shown by proving "there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different."  *Id.* at paragraph three of the syllabus.  "[T]he Court need not address both *Strickland* prongs if an appellant fails to prove either one."  *State v. Lortz*, 9th Dist. Summit No. 23762, 2008-Ohio-3108, ¶ 34.

{¶38}  Mr. Berila argues that his counsel should have called a forensic psychologist as a witness at trial on his behalf, due to J.S.' history of mental health issues and hospitalizations.  He notes that counsel presented no expert testimony at trial to rebut either J.S.' testimony or the contents of her medical records.  As a general rule, trial counsel's decision not to call an expert witness will not establish ineffective assistance.  *State v. Hanford*, 9th Dist. Summit No. 29204, 2019-Ohio-2987, ¶ 37.  *See also State v. Coombs*, 9th Dist. Lorain No. 03CA008262, 2004-Ohio-441, ¶ 26 ("[T]he decision whether to call an expert witness is simply a matter of trial strategy."); *State v. Spaulding*, 9th Dist. Summit No. 28526, 2018-Ohio-3663, ¶ 52 ("[C]ounsel's decision to rely on cross-examination instead of calling an expert witness to testify is not ineffective assistance.").  Moreover, when the trial record is silent regarding the substance of a potential expert's testimony, establishing prejudice under *Strickland* requires proof outside of the record, and the claim is therefore not appropriately considered on direct appeal.  *Hanford* at ¶ 37.  Here, the record is silent as to what a forensic psychologist's testimony may have been regarding J.S.' mental health, so any arguments as to resulting prejudice are purely speculative.  *See id.*  We therefore find no merit in Mr. Berila's ineffective assistance of counsel argument.

{¶39} Mr. Berila's fourth assignment of error is overruled.

## ASSIGNMENT OF ERROR FIVE

THE STATE OF OHIO COMMITTED PROSECUTORIAL MISCONDUCT BY WITHOLDING (SIC) EXCULPATORY EVIDENCE. SAID MISCONDUCT CONSTITUTED PLAIN ERROR.

{¶40} In his fifth assignment of error, Mr. Berila argues that the prosecutor committed prosecutorial misconduct by withholding exculpatory evidence—i.e., 30,000 pictures confiscated from his home—which denied him a fair trial and constituted plain error. We disagree.

{¶41} "In deciding whether a prosecutor's conduct rises to the level of prosecutorial misconduct, a court determines if the prosecutor's actions were improper, and, if so, whether the defendant's substantial rights were actually prejudiced." *State v. Moreland*, 9th Dist. Summit No. 27910, 2016-Ohio-7588, ¶ 22. "'[A] judgment may only be reversed for prosecutorial misconduct when the improper conduct deprives the defendant of a fair trial.'" *Id.*, quoting *State v. Knight*, 9th Dist. Lorain No. 03CA008239, 2004-Ohio-1227, ¶ 6. The defendant must show that, but for the prosecutor's misconduct, the trier of fact would not have convicted him. *Id.* "The touchstone of the analysis 'is the fairness of the trial, not the culpability of the prosecutor.'" *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, ¶ 140, quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982).

{¶42} If the State withholds material, exculpatory evidence, it offends a criminal defendant's due process rights. *State v. Charlton*, 9th Dist. Lorain No. 12CA010206, 2014-Ohio-1330, ¶ 32, citing *Brady v. Maryland*, 373 U.S. 83 (1963). "'There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.'" *State v. Jalowiec*, 9th Dist. Lorain No. 14CA010548, 2015-Ohio-5042, ¶ 31, quoting *Strickler v. Greene*, 527 U.S. 263, 281-

282 (1999). "It is [the] [d]efendant's burden to establish that the evidence is both favorable and material and that there is reasonable probability that the outcome would have been different if the evidence had been provided." *State v. Whalen*, 9th Dist. Lorain No. 08CA009317, 2008-Ohio-6739, ¶ 8.

{¶43} Mr. Berila never objected to any alleged prosecutorial misconduct at the trial court level and is therefore limited to arguing plain error on appeal. *See State v. Warrington*, 9th Dist. Medina No. 14CA0080-M, 2016-Ohio-244, ¶ 13. "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Crim.R. 52(B). "To establish plain error, one must show (1) an error occurred, i.e., a deviation from a legal rule, (2) the error is plain, i.e., an obvious defect in the proceedings, and (3) the error affected a substantial right, i.e., affected the outcome of the proceedings." *State v. Grant*, 9th Dist. Summit No. 29259, 2019-Ohio-3561, ¶ 5, citing *State v. Morgan*, 153 Ohio St.3d 196, 2017-Ohio-7565, ¶ 36. Notice of plain error "is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.

{¶44} In executing a search warrant on Mr. Berila's home, the police seized approximately 30,000 pictures. During cross-examination, the prosecutor asked Mr. Berila if he ever received Officer Thompson's message to come pick up his property, and Mr. Berila said he had not. Mr. Berila now claims that these pictures were exculpatory in nature, but he only states that they "[show him] with J.S. at family gatherings and vacations * * *." He neglects to explain how these pictures are in any way exculpatory, i.e., they are favorable to him and would have led to an acquittal. *See Whalen* at ¶ 8 (defining "exculpatory evidence" as evidence favorable to the accused which, if disclosed and used effectively, may make the difference between conviction and

acquittal). Mr. Berila has also failed to demonstrate how any of these pictures were suppressed by the prosecutor. *See Jalowiec*, at ¶ 31 (requiring the evidence to be suppressed by the prosecutor for a *Brady* violation). The pictures were seized from Mr. Berila's home, and he, in turn, knew they existed and even described what they depicted; we therefore cannot say that the pictures were suppressed by the State in violation of *Brady*. *See, e.g., State v. Ketterer*, 126 Ohio St.3d 448, 2010-Ohio-3831, ¶ 53-54. The record further reveals that the police actively reached out to Mr. Berila to return his pictures to him. Mr. Berila simply failed to respond. He has failed to demonstrate any improper conduct on the part of the prosecutor denying him a fair trial. *See Moreland* at ¶ 22. Because Mr. Berila has failed to show any error, let alone plain error, his argument must fail.

{¶45} Mr. Berila's fifth assignment of error is overruled.

III.

{¶46} Mr. Berila's assignments of error are all overruled. The judgment of the Medina County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Medina, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period

for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

_____
THOMAS A. TEODOSIO
FOR THE COURT

CALLAHAN, P. J.
CARR, J.
CONCUR.

APPEARANCES:

ERIC D. HALL, Attorney at Law, for Appellant.

S. FORREST THOMPSON, Prosecuting Attorney, and VINCENT V. VIGLUICCI, Assistant Prosecuting Attorney, for Appellee.